# EXHIBIT "B"



**ORDERED in the Southern District of Florida on August 2, 2024.**

*Corali Lopez-Castro*

**Corali Lopez-Castro, Judge**
**United States Bankruptcy Court**

_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| BIRD GLOBAL, INC., *et al.*,[1] | Case No. 23-20514-CLC |
| Debtors. | (Jointly Administered) |

**AMENDED[2] ORDER (I) APPROVING THE FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION ON A FINAL BASIS, (II) CONFIRMING THE DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION, (III) APPROVING THE INSURANCE SETTLEMENT AGREEMENTS, AND (IV) ENTERING BAR ORDER AND CHANNELING INJUNCTION**

**THIS MATTER** came before the Court (the "Bankruptcy Court" or "Court")[3] on the 10th and 12th days of June, 2024 and on the 29th day of July, 2024 (the "Confirmation Hearing") in

---

[1]    The address of the Debtors is 392 Northeast 191st Street, #20388, Miami, FL 33179. The last four digits of the Debtors' federal tax identification numbers are: (i) Bird Global, Inc. (3155); (ii) Bird Rides, Inc. (9939); (iii) Bird US Holdco, LLC (8390); (iv) Bird US Opco, LLC (6873); and (v) Skinny Labs, Inc. (8176).

[2]    Amended to delete former paragraph 50 waiving the 14-day stay.

[3]    Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to such terms in the Plan.

13063866-11

Miami, Florida, to consider final approval of the *First Amended Disclosure Statement for Debtors'
First Amended Joint Chapter 11 Plan of Liquidation*, dated April 29, 2024 [ECF No. 642] (the
"Disclosure Statement" or "First Amended Disclosure Statement")[4] and confirmation of the
*Debtors' Second Amended Joint Chapter 11 Plan of Liquidation*, dated June 3, 2024 [ECF No.
802] (the "Plan" or "Second Amended Plan"), including approval of the Insurance Settlement
Agreements and imposition of the Bar Order and Channeling Injunction in connection therewith,
each filed by the Debtors, Bird Global, Inc., Bird Rides, Inc., Bird US Holdco, LLC, Bird US
Opco, LLC, and Skinny Labs, Inc (collectively, the "Debtors" or "Plan Proponents").

The Court entered, after notice and a hearing, that certain *Order (I) Conditionally
Approving Disclosure Statement; (II) Approving Solicitation Procedures; (III) Approving
Customized Ballot; (IV) Establishing Notice and Objection Procedures in Respect of Confirmation
of the Debtors' Chapter 11 Plan; and (V) Shortening Time for Filing Final Applications for
Compensation and for Providing Notice of Hearing Thereon* [ECF No. 644] (the "Conditional
Approval Order") which, among other things, conditionally approved the *Disclosure Statement for
Debtors' Joint Chapter 11 Plan of Liquidation* filed by the Debtors on April 18, 2024 (the "Initial
Disclosure Statement") [ECF No. 596], as amended per direction of the Court [ECF No. 642], as
containing "adequate information" regarding the *Debtors' Joint Chapter 11 Plan of Liquidation*
(the "Initial Plan") [ECF No. 597] in accordance with 11 U.S.C. §1125(a), and approved the
solicitation and voting procedures, as well as approved, in final form and content, (i) a customized
ballot for creditors to accept or reject the Plan (the "Ballots"), including the Ballots for the

---

[4]     The Debtors filed a *Second Amended Disclosure Statement for Debtors' Second Amended Joint Chapter 11 Plan
of Liquidation*, dated June 3, 2024 [ECF No. 801] (the "Second Amended Disclosure Statement") which
corresponded to the changes made to the Second Amended Plan, none of which adversely affected any claimant.
Notwithstanding the changes to the Second Amended Disclosure Statement and as determined by the Court on
the record at the Confirmation Hearing, the First Amended Disclosure Statement contains adequate information.

2

following six voting Classes—Class 2 (Senior DIP Deficiency Claim), Class 3 (Additional DIP Funding Claim), Class 4 (Miscellaneous Secured Claims), Class 5 (General Unsecured Claims), and Class 6 (Tort Claims), and Class 7 (Subordinated Claims), in the form attached as Exhibit B to that certain *Expedited Motion for Entry of Order (I) Conditionally Approving Disclosure Statement; (II) Approving Solicitation Procedures; (III) Approving Customized Ballot; (IV) Establishing Notice and Objection Procedures in Respect of Confirmation of the Debtors' Chapter 11 Plan; and (V) Shortening Time for Filing Final Applications for Compensation and for Providing Notice of Hearing Thereon* [ECF No. 601] (the "Solicitation Procedures Motion"), (ii) Debtors' solicitation letter (the "Solicitation Letter"), in the form attached to the Solicitation Procedures Motion as Exhibit C, (iii) the Confirmation Hearing Notice, in the form attached to the Solicitation Procedures Motion as Exhibit D, (iv) the Notice of Non-Voting Status, in the form attached to the Solicitation Procedures Motion as Exhibit E, and (v) the Notice Party Letter attached to the Solicitation Procedures Motion as Exhibit F.

The Court finds that the Solicitation Package (as defined below) was duly transmitted to holders of Claims entitled to vote on the Plan as provided in the Conditional Approval Order and that the Notice of Non-Voting Status and Confirmation Hearing Notice was duly transmitted to the Non-Voting Classes (as defined below). The Court further finds that due notice of (i) entry of the Conditional Approval Order, (ii) the Confirmation Hearing, and (iii) the deadline for voting on, and/or objecting to, the Plan has been provided to holders of Claims against and Interests in the Debtors and all other parties in interest, in each case in accordance with the Conditional Approval Order, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Bankruptcy Rules for the Southern District of Florida (the

"Local Bankruptcy Rules").  Such notice as set forth above was sufficient under the circumstances and no other or further notice was required.

The following Objections to confirmation of the Plan and/or final approval of the Disclosure Statement were filed:

- *United States Trustee's Limited Objection to the Debtors' First Amended Disclosure Statement and First Amended Joint Plan of Liquidation* [ECF No. 769] (the "UST Objection");

- *Objection and Reservation of Rights of Aris Lakota Nicola Garcia to Debtors' First Amended Joint Chapter 11 Plan of Liquidation and Debtors' First Amended Disclosure Statement* [ECF No. 765] (the "Garcia Objection");

- *Tanisha Brown's Joinder in Objection and Reservation of Rights to Debtors' First Amended Joint Chapter 11 Plan of Liquidation and Debtors' First Amended Disclosure Statement Filed by Aris Lakota Nicola Garcia* [ECF No. 771] (the "Brown Joinder");[5]

- *Objection of Creditors Alesia Truxell, Administratrix of the Estate of Lawrence Chertik, III, and with Lawrence J. Chertik, Jr. as Parents of Lawrence Chertik, III, Deceased, Jacob Speller and Jennifer Vining, c/o Law Offices of Lee W. Davis, Esq. to Debtors' Motion for an Order Approving: (I) the Settlement Agreement and Release Between the Debtors and Lexington Insurance Company; (II) the Sale of Certain Insurance Policies to Lexington Insurance Company; and (III) Certain Other Relief to be Provided to Lexington Insurance Company in Connection with the Joint Plan of Liquidation* [ECF No. 775] (the "Truxell Lexington Objection");

- *Objection of Creditors Alesia Truxell, Administratrix of the Estate of Lawrence Chertik, III, Deceased, and with Lawrence J. Chertik, Jr. as Parents of Lawrence Chertik, Jacob Speller and Jennifer Vining, c/o Law Offices of Lee W. Davis, Esq. to Debtors' First Amended Disclosure Statement for Debtors' First Amended Joint Chapter 11 Plan of Liquidation and First Amended Chapter 11 Plan of Reorganization* [ECF No. 777] (the "Truxell Plan Objection," and together with the Truxell Lexington Objection, the "Truxell Objections");

- *Donna Jackson Tchirkow's Objection to Debtors' First Amended Joint Chapter 11 Plan of Liquidation* [ECF No. 778] (the "Tchirkow Objection");

---

[5]  Tanisha Brown also filed a separate joinder to the California Plaintiffs' Objections. [ECF No. 832].

- *Donna Jackson Tchirkow's Objection to Debtors' Second Amended Joint Chapter 11 Plan of Liquidation* [ECF No. 911] (the "Second Tchirkow Objection,"[6] and together with the Tchirkow Objection, the "Tchirkow Objections");

- *Creditor Citibank, N.A.'s Limited Objection and Reservation of Rights Regarding Debtors' First Amended Joint Chapter 11 Plan of Liquidation and Debtors' First Amended Disclosure Statement* [ECF No. 776] (the "Citibank Objection");

- *Hillsborough County Tax Collector's Objection to Confirmation of Debtors' Joint Chapter 11 Plan of Liquidation* [ECF No. 782] (the "Hillsborough County Objection");

- *Tort Claimants' Objection to Debtors' First Amended Joint Chapter 11 Plan and First Amended Disclosure Statement* [ECF No. 779] (the "Abbo Objection");

- *Erik Longshaw's Joinder to Tort Claimants' Objection to Debtors' First Amended Joint Chapter 11 Plan and First Amended Disclosure Statement* [ECF No. 781] (the "Longshaw Joinder");

- *California Plaintiffs' Objection to Debtors' First Amended Plan of Liquidation* [ECF No. 789] (the "California Plaintiffs' Plan Objection"); and

- *Objection to Entry of Final Orders and Motion to Determine Related-To Jurisdiction* [ECF No. 793] (the "California Plaintiffs' Jurisdiction Objection," and together with the California Plaintiffs' Plan Objection, the "California Plaintiffs' Objections") (collectively with all objections and joinders, the "Objections").

The UST Objection was resolved by removal of the third-party release provisions from the Plan. The Garcia Objection was withdrawn [ECF No. 766]. The Citibank Objection was resolved by the Debtors' agreement to include in this Confirmation Order the proposed language (below) requested in the Citibank Objection. The Hillsborough County Objection was resolved based upon agreement to pay the underlying Claim (Claim No. 176) in full, in cash, promptly upon verification of the amount asserted ($7,250.85).

The Court also considered the following:

---

[6]  Dunya Abbo, Erik Longshaw, and Alesia Truxell, each Tort Claimants who filed their own objections, also filed joinders to the Second Tchirkow Objection. *See* [ECF Nos. 914, 915, 919].

5

- *Debtors' Memorandum of Law in Support of Confirmation of the Debtors' Second Amended Joint Chapter 11 Plan of Liquidation* [ECF No. 863] (the "<u>Confirmation Brief</u>"), which Confirmation Brief responded to each Objection;

- *Declaration of Emily Young, on Behalf of Epiq Corporate Restructuring, LLC, Regarding the Solicitation and Tabulation of Ballots on the Debtors' First Amended Joint Chapter 11 Plan of Liquidation* [ECF No. 856] (the "<u>Epiq Declaration</u>");

- *Debtors' Certificate of Proponents of Plan on Acceptance of Plan, Report on Amount to be Deposited, Certificate of Amount Deposited and Payment of Fees* [ECF No. 857] (the "<u>Ballot Report</u>"), which Ballot Report described, among other things, the methodology for the tabulation and results of voting with respect to the Plan and evidencing that the Debtors have received the requisite acceptances of the Plan in both number and amount as required by section 1126 of the Bankruptcy Code for all Classes entitled to vote except for Class 6;

- *Notice of Filing California Plaintiffs' Declarations* [ECF No. 794], as amended [ECF Nos. 870, 902] (the "<u>California Plaintiffs' Declarations</u>");

- *Declaration of Ian Beckett in Support of Confirmation and Approval of the Underwriters' Insurance Settlement Agreement in support of A) Second Amended Disclosure Statement for Debtors' Second Amended Joint Chapter 11 Plan of Liquidation [ECF No. 801] and, B) Debtors' Second Amended Joint Chapter 11 Plan of Liquidation [ECF No. 802]* [ECF No. 858] (the "<u>Beckett Declaration</u>");

- *Declaration of James S. Feltman, Financial Advisor to the Debtors, in Support of Confirmation* [ECF No. 860] (the "<u>Feltman Declaration</u>");

- *Declaration of Christopher Rankin in Support of Confirmation* [ECF No. 861] (the "<u>Rankin Declaration</u>");

- *Declaration of Michael Washinushi in Support of Confirmation of Second Amended Plan and Approval of the Underwriters' Insurance Settlement Agreement* [ECF No. 867] (the "<u>Washinushi Declaration</u>");

- *Declaration of Brad J. Safon, Esquire, Expert Witness for Lloyd's, London Syndicates Numbers 1969 and 1971* [ECF No. 868] (the "<u>Safon Declaration</u>");

- *Declaration of Catherine M. Kelly* [ECF No. 871] (the "<u>Kelly Declaration</u>");

- *Declaration of Shawn M. Robinson* [ECF No. 873] (the "<u>Robinson Declaration</u>");

- *Declaration of Ardell Johnson* [ECF No. 874] (the "<u>Johnson Declaration</u>"); and

- *Declaration of Anthony M. Miera* [ECF No. 876] (the "Miera Declaration," and, together with the Epiq Declaration, the California Plaintiffs' Declarations, the Beckett Declaration, the Feltman Declaration, the Rankin Declaration, the Washinushi Declaration, the Safon Declaration, the Kelly Declaration, the Robinson Declaration, the Johnson Declaration, and the Miera Declaration, collectively, the "Declarations").

The Court also considered the following briefs filed after the Supreme Court's June 27, 2024 decision in *Harrington v. Purdue Pharma, L.P.*, 144 S. Ct. 2071 (2024) ("Purdue"):

- *United States Trustee's Post Confirmation Statement* [ECF No. 1130];

- *Debtors' Brief Regarding the Supreme Court's Opinion in Harrington v. Purdue Pharma, L.P.* [ECF No. 1133];

- *Underwriters' Joinder and Supplement to Debtors' Brief Regarding the Supreme Court's Opinion in Harrington v. Purdue Pharma, L.P.* [ECF No. 1135];

- *Municipalities' Joinder and Supplement to Debtors' Brief Regarding Supreme Court's Opinion in Harrington v. Purdue Pharma, L.P.* [ECF No. 1138];

- *Third Lane Mobility, Inc's Joinder in and Supplement to Briefs Regarding the Supreme Court Opinion in Harrington v. Purdue Pharma, L.P. and Related Filings* [ECF No. 1139];

- *Pittsburgh Plaintiffs' Brief and Objection to Debtors' Second Amended Plan of Reorganization* [ECF No. 1131];

- *California Plaintiffs' Supplemental Brief in Opposition to Confirmation* [ECF No. 1132];

- *Tort Claimants' Supplemental Brief in Support of Their Objection to Debtors' Chapter 11 Plan and Disclosure Statement* [ECF No. 1134]; and

- *Donna Jackson Tchirkow's Brief on The Effects of Harrington v. Purdue Pharma L.P. on the Proposed Bar Order and Channeling Injunction* [ECF No. 1137] (collectively with the other briefs set forth above addressing *Purdue*, the "Purdue Briefs").

The Court having reviewed, analyzed, and considered the Disclosure Statement, the Plan, the Conditional Approval Order, the Objections, the Confirmation Brief, the Declarations, the Supreme Court's decision in *Purdue*, the *Purdue* Briefs, the Ballot Report, and all related

documents and applicable decisional law; and the appearance of all interested parties having been duly noted in the record of the Confirmation Hearing, including the testimony of witnesses and the exhibits admitted into evidence in connection therewith; the arguments of counsel; and upon all of the proceedings had before the Bankruptcy Court and upon the entire record of the Confirmation Hearing; and the Bankruptcy Court having determined based upon all of the foregoing that the Disclosure Statement should be approved on a final basis, the Plan should be confirmed and the Insurance Settlement Agreements approved, including the issuance of the Bar Order and the Channeling Injunction in connection therewith, each as reflected by the Bankruptcy Court's rulings made and incorporated herein and on the record of the Confirmation Hearing, including the Court's oral ruling on July 29, 2024; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY FOUND, DETERMINED, ORDERED, ADJUDGED, AND DECREED, AS FOLLOWS:

## **FINDINGS OF FACT**

A.      <u>Findings and Conclusions</u>.  The findings of fact and conclusions of law set forth herein and on the record of the Confirmation Hearing constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  The Court incorporates by reference all findings of fact and conclusions of law set forth on the record at the Confirmation Hearing as if set forth fully herein.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      <u>Jurisdiction</u>.  The Court has jurisdiction over the Debtors' Chapter 11 Cases (as defined below), final approval of the Disclosure Statement, confirmation of the Plan and approval

of the Insurance Settlement Agreements pursuant to 28 U.S.C. § 1334. Final approval of the Disclosure Statement, confirmation of the Plan and approval of the Insurance Settlement Agreements are each core proceedings pursuant to 28 U.S.C. § 157(b) and this Court has jurisdiction to enter a final order consistent with Article III of the United States Constitution with respect thereto. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409. The Debtors are proper plan proponents under sections 1121(a) and (c) of the Bankruptcy Code.

C.  <u>Commencement and Joint Administration of the Debtors' Chapter 11 Cases</u>. On December 20, 2023 (the "<u>Petition Date</u>"), each of the above-captioned Debtors commenced a case under chapter 11 of the Bankruptcy Code (collectively, the "<u>Chapter 11 Cases</u>"). By prior order of the Court, the Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015. The Debtors have operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

D.  <u>Appointment of Creditors' Committee</u>. On January 5, 2024, the U.S. Trustee appointed the Committee [ECF No. 118], as amended on January 7, 2024 [ECF No. 119] and April 23, 2024 [ECF No. 617]. As of the date hereof, the members of the Committee are Alesia Truxell and Lloyd's of London Syndicates 1969 & 1971.

E.  <u>Judicial Notice</u>. The Bankruptcy Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Court, including, without limitation, all pleadings and other documents filed, all orders entered, all adversary proceedings and all evidence and arguments made, proffered or adduced at the hearings held before the Bankruptcy Court during the pendency of the Chapter 11 Cases.

F.      Burden of Proof.  The Debtors have met their burden of proving compliance with each element of sections 1125 and 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence.

G.      Adequacy of Disclosure Statement.  The Disclosure Statement contains "adequate information," as such term is defined in section 1125(a)(1) of the Bankruptcy Code, with respect to the Debtors' Plan and the transactions contemplated therein, and is approved on a final basis.

H.      Solicitation and Notice.  On April 19, 2024, the Bankruptcy Court entered the Conditional Approval Order, which, among other things, conditionally approved the First Amended Disclosure Statement, finding that it contained "adequate information" within the meaning of section 1125(a)(1) of the Bankruptcy Code, and established procedures for the Debtors' solicitation and tabulation of votes on the Plan.  The (a) Conditional Approval Order (without exhibits), (b) Ballot for each Class voting on the Plan, (c) Solicitation Letter, and (d) Confirmation Hearing Notice (collectively, the "Solicitation Package"), were served in compliance with the Bankruptcy Code, the Bankruptcy Rules, and the Conditional Approval Order (the "Solicitation").  As evidenced by the *Notice of Filing Proof of Publication* [ECF No. 680], as corrected [ECF No. 681], the Debtors published *Notice of (A) Deadline for Casting Votes to Accept or Reject Plan of Liquidation, (B) Hearing to Consider Confirmation of Plan of Liquidation, and (C) Related Matters* in *The New York Times* (National Edition) as required by the Conditional Approval Order.  As described in the Conditional Approval Order, and as set forth in the Epiq Declaration, (i) the service of the Solicitation Package was adequate and sufficient under the circumstances of these Chapter 11 Cases, and (ii) adequate and sufficient notice of the Confirmation Hearing and other requirements, deadlines, hearings and matters described in the Conditional Approval Order was timely provided in compliance with the requirements of the Conditional Approval Order,

10

Bankruptcy Rules and provided due process to all parties in interest. No other or further notice is required.

       I.      <u>Voting</u>. Votes on the Plan were solicited after disclosure of "adequate information" as defined in section 1125(a)(1) of the Bankruptcy Code. As evidenced by the Epiq Declaration and the Ballot Report, votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith and in a manner consistent with the Conditional Approval Order, the Bankruptcy Code, and the Bankruptcy Rules.

       J.      <u>Notice of Non-Voting Status</u>. The (a) Notice of Non-Voting Status and (b) Confirmation Hearing Notice were served in compliance with the Conditional Approval Order upon the Holders of Claims that are: (i) not classified under the Plan; (ii) in Class 1 (Other Priority Claims); and (iii) Holders of Equity Interests (Class 8) (collectively, the "<u>Non-Voting Classes</u>").

       K.      <u>Plan Modifications</u>. To resolve informal comments to the Plan from the Committee, the Debtors have made the following modifications to the Plan:

>     i.    **Revision to Existing Definition:** The definition of "Tort Claims Administrator" is revised to add "Tort Claims" before "Trust Assets" as follows:

**Tort Claims Administrator** means the Person, if any, selected by the Tort Claims Trustee subject to approval by the Bankruptcy Court after notice and a hearing who shall have the duties and responsibilities as more fully set forth in the Tort Claim ADR Procedures.

>     ii.    **Revision to Section 7.12(d):** The provision under "Objections and Litigation After the Effective Date" under Article VII of the Plan is revised simply to substitute Tort Claims Administrator for Tort Claims Trustee as set forth below:

<u>Objections and Litigation After the Effective Date</u>. As of the Effective Date, the Tort Claims shall be analyzed exclusively by the Tort Claims Trustee pursuant to the Tort Claim ADR Procedures. The Liquidating Trustee, the Settling Insurers and Municipalities shall have no right to object to any Tort Claim or any role in analyzing, assigning relative values to, and allocating Tort Claims Trust Assets to any Tort Claim.

L.    Inclusion of Requested Provisions in Confirmation Order. To resolve (a) the Citibank Objection, and (b) informal requests by (i) the Securities and Exchange Commission, (ii) Texas Comptroller, (iii) James Gehly, Carrie Williams and Bill Lyons, (iv) certain Texas Taxing Authorities, and (v) Liberty Mutual, the Debtors have agreed to include the following provisions in this Confirmation Order:

a.    **Citibank**:

Notwithstanding anything to the contrary in the Plan [ECF No. 643], or an order confirming the Plan, with respect to and to the extent of all indebtedness or obligations owed to Citibank, N.A. ("Citibank") by the Debtors or any assignee of, or successor in interest to, the Debtors with respect to the standby letters of credit set forth in Citibank's proof of claim filed in these cases (Claim No. 10271) and any other letters of credit issued, amended, increased, or to be issued, if any (the "LCs"), pursuant to the Continuing Agreement for Standby Letters of Credit dated October 28, 2019, which are secured by a Citibank Agency and Trust Account ending in 0000 (the "Collateral Account") pursuant to an Assignment and Security Agreement (Accounts) dated November 1, 2019, granted by the Debtors for the benefit of Citibank, and the cash contained in such account on the Petition Date, and any additional cash deposited thereafter as additional security required to secure the LCs, the "Citibank Collateral," Citibank has and shall continue to have a valid and perfected, non-avoidable first priority lien with respect to the Citibank Collateral to reimburse any amounts owed to Citibank related to the LCs and/or the obligations provided for under the aforementioned documents, and such lien and Citibank's rights with respect to the Citibank Collateral shall not be in any way impaired by or as a result of any relief granted to any party with respect to the Sale Order [ECF No. 464] or the Plan or otherwise, notwithstanding any assumption or assignment of any of the aforementioned documents, and Citibank has and shall continue to have recourse to the Citibank Collateral pursuant to the applicable terms of the aforementioned documents.

b.    **Securities and Exchange Commission**

Preservation of SEC Police and Regulatory Powers:  Notwithstanding any provision to the contrary, nothing in the Plan, Plan Documents or the Confirmation Order shall (i) release, enjoin, or discharge any monetary or non-monetary claim, right or cause of action of the U.S. Securities and Exchange Commission (the "SEC") against any non-debtor Person or non-debtor Entity, or (ii) prevent, restrict, limit, enjoin, or impair the SEC from commencing or continuing any investigation, action or proceeding against any non-debtor Person or non-debtor Entity in any non-bankruptcy forum.

### c.     **Texas Comptroller**

Notwithstanding anything else to the contrary in the Plan or this Confirmation Order, the following provisions will govern the treatment of the claims of the Texas Comptroller of Public Accounts (the "<u>Texas Comptroller</u>"): (1) nothing provided in the Plan or this Confirmation Order shall affect or impair any statutory or common law setoff rights of the Texas Comptroller in accordance with 11 U.S.C. § 553; (2) nothing provided in the Plan or this Confirmation Order shall affect or impair any rights of the Texas Comptroller to pursue any non-debtor third parties for tax debts or claims; (3) nothing provided in the Plan or this Confirmation Order shall be construed to preclude the payment of interest on the Texas Comptroller's administrative expense tax claims, if any; and (4) the Texas Comptroller's administrative expense claims (Claim Nos. 10571, 10578, and 10579) are allowed, subject and without prejudice to objection on substantive grounds. In no event shall the Texas Comptroller be paid in a payment schedule that extends past sixty (60) months of the Debtors' bankruptcy petition date.

### d.     **James Gehly, Carrie Williams and Bill Lyons**

Notwithstanding anything contained in the Plan to the contrary, including any discharge, release or injunction, and subject to (a) the Liquidating Trustee confirming, or (b) the Bankruptcy Court's entry of an Order finding, that the Debtors had available insurance coverage that would address their claims, James Gehly, Carrie Williams and Bill Lyons (the "<u>Employment Practices Claimants</u>") shall be granted relief from the automatic stay and the plan injunction solely for the purpose of pursuing their claims against the Debtors to the extent of any available coverage under the Debtors' employment practices insurance policy(ies).

### e.     **Texas Taxing Authorities**

Notwithstanding anything to the contrary in the Plan, Sale Order, Asset Purchase Agreement, and the Global Settlement Term Sheet all post-petition ad valorem tax liabilities (tax year 2024 and subsequent tax years) owing to the Texas Taxing Authorities[7] are Assumed Liabilities of the Purchaser and remain secured by the statutory liens of the Texas Taxing Authorities on the Acquired Assets. Any dispute regarding any proration of the ad valorem taxes between the Debtors and Purchaser shall have no effect on Purchaser's responsibility to pay the 2024 ad valorem taxes in accordance with applicable law. The Texas Taxing Authorities shall retain their respective liens against the Acquired Assets for tax year 2024, as applicable, until paid in full, including any applicable penalties or interest.

---

[7]     The Texas Taxing Authorities consist of the following entities: Bexar County, Dallas County, City of Frisco, Jefferson County, Little Elm Independent School District, Matagorda County, San Marcos Independent School District, Bowie Central Appraisal District, Denton County, Hays County, Taylor County Central Appraisal District, Frisco Independent School District and Randall County Tax Office.

f.  **Liberty Mutual**

Nothing in the Plan, the Plan Documents or this Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way impair, alter, supplement, change, expand, decrease, or modify the rights or obligations of Liberty Mutual Insurance Company (including its parents, affiliates, subsidiaries, successors and assigns collectively, "Liberty Mutual") or the Debtors, arising out of, under, or relating to the Debtors' Auto Insurance Policies. Nothing in the Plan, Plan Supplement, or Confirmation Order shall operate to require Liberty Mutual to pay under any of the Debtors' Auto Insurance Policies for the liability of any person or entity that was not an insured thereunder before the Closing Date for any liability that arose before the Closing Date. Furthermore, nothing in the Plan, Plan Documents or Confirmation Order shall be deemed to constitute a trial, adjudication, judgment, hearing on the merits, finding, conclusion, or determination of the consequences or effect of the Plan, the Plan Documents, or this Confirmation Order with respect to the Debtors' Auto Insurance Policies.

## COMPLIANCE WITH SECTION 1129 OF THE BANKRUPTCY CODE

M.  <u>Plan Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(1))</u>.  The Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

N.  <u>Proper Classification (11 U.S.C. §§ 1122 and 1123(a)(1))</u>.  In addition to Administrative Expense Claims, Professional Compensation Claims, and Priority Tax Claims, which need not be classified, Article III of the Plan designates the following seven classes of Claims and one class of Interests: Class 1 (Other Priority Claims), Class 2 (Senior DIP Deficiency Claim), Class 3 (Additional DIP Funding Claim), Class 4 (Miscellaneous Secured Claims), Class 5 (General Unsecured Claims), Class 6 (Tort Claims), Class 7 (Subordinated Claims), and Class 8 (Equity Interests).  Each of the Claims or Interests, as the case may be, in each particular Class is substantially similar to the other Claims or Interests within such Class.  Valid business, legal and factual reasons exist for separately classifying the various Claims and Interests pursuant to the Plan, and such Classes do not unfairly discriminate between holders of Claims and Interests.  The Plan therefore satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

O.      Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2)).  Article III of the Plan specifies that Class 1 (Other Priority Claims) is Unimpaired under the Plan, thereby complying with section 1123(a)(2) of the Bankruptcy Code.  The Plan therefore satisfies section 1123(a)(2) of the Bankruptcy Code.

P.      Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)).  Article III of the Plan designates Class 2 (Senior DIP Deficiency Claim), Class 3 (Additional DIP Funding Claim), Class 4 (Miscellaneous Secured Claims), Class 5 (General Unsecured Claims), Class 6 (Tort Claims), Class 7 (Subordinated Claims), and Class 8 (Equity Interests) as Impaired, and Article III, Section 3.2(a)-(h) of the Plan specifies the treatment of Claims and Interests in such Classes, thereby complying with section 1123(a)(3) of the Bankruptcy Code.  The Plan therefore satisfies section 1123(a)(3) of the Bankruptcy Code.

Q.      No Discrimination (11 U.S.C. § 1123(a)(4)).  The Plan provides for the same treatment for each Claim or Interest in each respective Class unless the holder of a particular Claim or Interest has agreed to a less favorable treatment on account of such Claim or Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.  The Plan therefore satisfies section 1123(a)(4) of the Bankruptcy Code.

R.      Implementation of the Plan (11 U.S.C. § 1123(a)(5)).  The Plan provides adequate and proper means for the implementation of the Plan as required by section 1123(a)(5) of the Bankruptcy Code, including by virtue of the approval of the Insurance Settlement Agreements.  The Plan therefore satisfies section 1123(a)(5) of the Bankruptcy Code.

S.      Non-Voting Equity Securities/Allocation of Voting Power (11 U.S.C. § 1123(a)(6)).  As a liquidating plan, the Plan does not provide for the issuance of nonvoting equity securities.  As such, the Plan satisfies section 1123(a)(6) of the Bankruptcy Code.

T.      <u>Designation of Directors and Officers (11 U.S.C. § 1123(a)(7))</u>.  The identity and affiliation of any individuals proposed to serve, after confirmation of the Plan, have been disclosed, as the (i) Liquidating Trustee has been disclosed in the Liquidating Trust Agreement, which was attached to the Plan as Exhibit 5, as well as in Section 1.1(100) of the Plan; and (ii) Tort Claims Trustee has been disclosed in the Tort Claims Trust Agreement which was attached as Schedule 4 to the Underwriters' Insurance Settlement Agreement, which was attached to the Plan as Exhibit 1, as well as in Section 7.5 of the Plan, both filed prior to the Confirmation Hearing.  Accordingly, the selection of each of the Liquidating Trustee and Tort Claims Trustee is consistent with the interests of creditors, equity security holders, and public policy.  As such, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code.

U.      <u>Additional Plan Provisions (11 U.S.C. § 1123(b))</u>.  The other provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1123(b) of the Bankruptcy Code.  The failure to specifically address a provision of the Bankruptcy Code in this Confirmation Order shall not diminish or impair the effectiveness of this Confirmation Order or such provisions.

V.      <u>Impairment/Unimpairment of Classes of Claims and Interests (11 U.S.C. § 1123(b)(1))</u>.  As contemplated by section 1123(b)(1) of the Bankruptcy Code, Classes 2, 3, 4, 5, 6, 7, and 8 are Impaired by the Plan, and Class 1 is Unimpaired.  Accordingly, the Plan satisfies section 1123(b)(1) of the Bankruptcy Code.

W.      <u>Assumption and Rejection of Executory Contracts (11 U.S.C. § 1123(b)(2))</u>.  In accordance with section 1123(b)(2) of the Bankruptcy Code, Section 11.1 of the Plan provides, among other things, that any remaining executory contracts and unexpired leases that exist between the Debtors and any Person or Entity shall be deemed rejected by the Debtors on the Effective Date

of the Plan, unless such executory contract or unexpired lease: (i) has been assumed and assigned to the Purchaser, (ii) has been rejected pursuant to an Order of the Bankruptcy Court entered prior to the Effective Date, (iii) as of the Effective Date, is subject to a pending motion to assume; (iv) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (v) is a D&O Liability Insurance Policy.  Accordingly, the Plan satisfies the requirements of section 1123(b)(2) of the Bankruptcy Code.

X.      <u>Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2))</u>.  The Debtors have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, including having complied with section 1125 of the Bankruptcy Code with respect to the Disclosure Statement and the Plan.

Y.      <u>Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3))</u>.  The Debtors are the proponents of the Plan.  The Debtors have proposed the Plan (including all documents necessary to effectuate the Plan) in good faith and not by any means forbidden by law, thereby complying with section 1129(a)(3) of the Bankruptcy Code.  The Debtors' good faith is evident from the record of these Chapter 11 Cases, including the Declarations, the entry by this Court of the Conditional Approval Order, the record of the Confirmation Hearing, and other proceedings held in these Chapter 11 Cases.  The Plan, including the Insurance Settlement Agreements, is based upon extensive, arm's length and good faith negotiations between and among the Debtors, the Committee, the Purchaser, the Settling Insurers, the Municipalities, the DIP Lenders, other creditors and such parties-in-interest, and represents the culmination of months of intensive negotiations and discussions among all parties in interest, including during multiple sessions of a Judicial Settlement Conference conducted by Hon. Paul G. Hyman, Jr., which was attended by multiple parties, including the above-referenced parties and certain Tort Claimants. *See* Rankin Declaration, ¶ 22.

Moreover, the Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' Estates and effectuating a successful liquidation of the Debtors. The Plan accomplishes maximization of the Debtors' Estates and equitable distribution of the Debtors' assets by providing the means through which the Debtors may effectuate distributions to the creditors. With two exceptions (Class 4 and Class 6), the Impaired Classes of Claims entitled to vote to accept or reject the Plan (Classes 2, 3, 5, and 7) have voted overwhelmingly to accept the Plan, and the overwhelming majority of the Debtors' creditors support the Plan. The U.S. Trustee objected to the Plan, but such objection was resolved. With respect to Class 4, no Holders of Claims in Class 4 voted to accept or reject the Plan. With respect to Class 4 and Class 6, the "cramdown" provisions of Section 1129(b) of the Bankruptcy Code are satisfied because (i) the Plan otherwise satisfies the requirements for confirmation under Section 1129(a) of the Bankruptcy Code; (ii) at least one impaired class of claims has accepted it without taking into consideration the votes of any insiders in such class (i.e., Classes 2, 3, 5, and 7); and (iii) the Plan is "fair and equitable" and does not "discriminate unfairly" as to Class 4 or Class 6. Further, the indemnification, exculpation, release, and injunction provisions of the Plan have been negotiated in good faith and at arm's length with, among other persons, representatives of the Debtors, parties in interest, and their respective advisors, are consistent with sections 105(a), 1122, 1123(b)(3)(A), 1123(b)(6), 1129(a), and 1142 of the Bankruptcy Code, and are each necessary to the Debtors' successful liquidation in chapter 11. Accordingly, the Plan and the related documents have been filed in good faith and the Plan Proponents have satisfied their obligations under section 1129(a)(3) of the Bankruptcy Code.

Z.     Payment for Services or Cost and Expenses (11 U.S.C. § 1129(a)(4)). Pursuant to the interim compensation procedures previously approved by this Court and established in these Chapter 11 Cases pursuant to section 331 of the Bankruptcy Code, all payments made or to be

made by the Debtors for services or for costs and expenses in connection with these Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, have been approved by, or are subject to the approval of, the Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.

AA. <u>Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5))</u>. The Debtors have complied with section 1129(a)(5) of the Bankruptcy Code. The identity and affiliation of any individuals proposed to serve, after confirmation of the Plan have been disclosed, as the name of the (i) Liquidating Trustee has been disclosed in the Liquidating Trust Agreement which was attached to the Plan as Exhibit 5, as well as in Section 1.1(100) of the Plan; and (ii) Tort Claims Trustee has been disclosed in the Tort Claims Trust Agreement which was attached as Schedule 4 to the Underwriters' Insurance Settlement Agreement which was attached to the Plan as Exhibit 1, as well as in Section 7.5 of the Plan, both filed prior to the Confirmation Hearing and integral parts of, and incorporated into, the Plan. As such, the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

BB. <u>No Rate Changes (11 U.S.C. § 1129(a)(6))</u>. No governmental regulatory commission has jurisdiction, after confirmation of the Plan, over the rates of the Debtors. Thus, section 1129(a)(6) of the Bankruptcy Code is not applicable in these Chapter 11 Cases.

CC. <u>Best Interests of Creditors (11 U.S.C. § 1129(a)(7))</u>. As demonstrated by the Rankin Declaration, the Epiq Declaration, the Ballot Report, and the Liquidation Analysis attached as Exhibit "2" to the Disclosure Statement, which employed commonly accepted methodologies and reasonable assumptions, with respect to each Impaired Class of Claims against or Interests in the Debtors, each holder of a Claim or Interest in such Class has accepted the Plan or will receive or retain pursuant to the Plan on account of such Claim or Interest property of a value, as of the

Effective Date, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. Accordingly, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code.

DD.     <u>Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8))</u>.  The Holders of Claims in Class 1 (Other Priority Claims) are Unimpaired by the Plan and therefore not entitled to vote and are deemed to accept the Plan.  The Holders of Claims in Class 2 (Senior DIP Deficiency Claim), Class 3 (Additional DIP Funding Claim), Class 5 (General Unsecured Claims), and Class 7 (Subordinated Claims), all of which are Impaired, have affirmatively voted overwhelmingly to accept the Plan pursuant to section 1126(c) of the Bankruptcy Code.  As such, section 1129(a)(8) is satisfied with respect to these Classes of Claims.  None of the Holders of Claims in Class 4 cast a ballot accepting or rejecting the Plan. Class 8 (Equity Interests) is deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code, because the Holders of Interests in Class 8 will not receive or retain any property on account of their Interests in the Debtors.  Class 6 (Tort Claims) voted to reject the Plan.  The Plan may nevertheless be confirmed because the Plan satisfies section 1129(b) of the Bankruptcy Code with respect to Classes 4, 6 and 8.

EE.     <u>Treatment of Administrative Expense Claims and Priority Tax Claims (11 U.S.C. § 1129(a)(9))</u>.  The treatment of Administrative Expense Claims and Priority Tax Claims pursuant to Article II of the Plan satisfies the requirements of sections 1129(a)(9) of the Bankruptcy Code.

FF.     <u>Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(10))</u>.  Class 2 (Senior DIP Deficiency Claim), Class 3 (Additional DIP Funding Claim), Class 5 (General Unsecured Claims), and Class 7 (Subordinated Claims), all of which are Impaired under the Plan and entitled to vote, overwhelmingly voted to accept the Plan by the requisite majorities set forth in section 1126(c) of the Bankruptcy Code, determined without including any acceptance of the Plan by any insider,

thereby satisfying the requirements of section 1129(a)(10) of the Bankruptcy Code. Specifically, as set forth in the Ballot Report, (i) 100.00% of the Creditors casting Ballots in Class 2, in number, and 100.00% in dollar amount of Allowed Claims in Class 2, voted to accept the Plan; (ii) 100.00% of the Creditors casting Ballots in Class 3, in number, and 100.00% in dollar amount of Allowed Claims in Class 3, voted to accept the Plan; (iii) 94.44% of the Creditors casting Ballots in Class 5, in number, and 98.68% in dollar amount of Allowed Claims in Class 5, voted to accept the Plan; and (iv) 100.00% of the Creditors casting Ballots in Class 7, in number, and 100.00% in dollar amount of Allowed Claims in Class 7, voted to accept the Plan. Therefore, the requirements of section 1129(a)(10) of the Bankruptcy Code have been satisfied with respect to Class 2, 3, 5, and 7. As stated, Class 4, which did not vote to accept or reject the Plan, Class 6, which voted to reject the Plan, and Class 8, which is deemed to have voted to reject the Plan, are Impaired. Because the Plan can be crammed down on Classes 4, 6 and 8 pursuant to section 1129(b) of the Bankruptcy Code, the Plan can be confirmed despite their failure to vote for or against the Plan, vote against the Plan, and deemed vote against the Plan, respectively.

GG.     Feasibility (11 U.S.C. § 1129 (a)(11)). The information in the Disclosure Statement and the evidence proffered or adduced at the Confirmation Hearing and set forth in the Rankin Declaration: (i) is persuasive and credible; (ii) has not been controverted by other evidence; and (iii) establishes that the Plan is feasible. As a result, there is a reasonable likelihood that the Debtors or Liquidating Trust, as the case may be, and the Tort Claims Trust will meet their respective financial obligations under the Plan, and because the Debtors are liquidating, confirmation of the Plan is not likely to be followed by any additional liquidation or need for further financial reorganization of the Debtors, thereby satisfying the requirements of section 1129(a)(11) of the Bankruptcy Code.

HH.     Payment of Fees (11 U.S.C. § 1129(a)(12)).  As required pursuant to Section 2.6 of the Plan, all fees payable under section 1930 of title 28 of the United States Code have been or will be paid on or after the Effective Date, thereby satisfying the requirements of section 1129(a)(12) of the Bankruptcy Code.  After the Effective Date, such fees shall only be payable until such time as a final decree is entered closing the Chapter 11 Cases, a Final Order converting such cases to cases under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing the Chapter 11 Cases is entered.  After the Effective Date, the Debtors or Liquidating Trustee, as applicable, shall pay the appropriate sums required pursuant to 28 U.S.C. § 1930(a)(6), when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee, until the earliest of the date on which the final Chapter 11 Cases are converted, dismissed, or closed.

II.     Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(13)).  The Debtors have no obligations with respect to retiree benefits.  Accordingly, section 1129(a)(13) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

JJ.     No Domestic Support Obligations (11 U.S.C. § 1129(a)(14)).  The Debtors are not required by a judicial or administrative order, or by statute, to pay a domestic support obligation. Accordingly, section 1129(a)(14) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

KK.     Debtors Are Not Individuals (11 U.S.C. § 1129(a)(15)).  The Debtors are not individuals. Accordingly, section 1129(a)(15) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

LL.     No Applicable Nonbankruptcy Law Regarding Transfers (11 U.S.C. § 1129(a)(16)).   The Debtors are moneyed, business, or commercial corporations, and/or

partnerships, as the case may be. Accordingly, section 1129(a)(16) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

MM.    <u>No Unfair Discrimination; Fair and Equitable (11 U.S.C. § 1129(b))</u>.  The Debtors have satisfied the requirements of sections 1129(b)(1) and (b)(2) of the Bankruptcy Code with respect to Class 4 (Miscellaneous Secured Claims), Class 6 (Tort Claims) (the "<u>Rejecting Class</u>") and Class 8 (Equity Interests) (the "<u>Presumed Rejecting Class</u>," and collectively with the Rejecting Class, the "<u>Rejecting Classes</u>").  Based on the evidence proffered or adduced at the Confirmation Hearing and in the Rankin Declaration, the Plan does not discriminate unfairly and is fair and equitable with respect to Class 4 and the Rejecting Classes, as required by sections 1129(b)(1) and (b)(2) of the Bankruptcy Code, because the legal rights of such Claims and Interests held in Class 4 and the Rejecting Classes are substantially dissimilar from the Classes of Claims receiving distributions under the Plan as well as substantially similar to each other within, respectively, Classes 4, 6 and 8.  The Plan is additionally "fair and equitable" as to (i) the Rejecting Class because Distributions to Holders of Claims in Class 7 shall be made <u>only</u> after Claims in Classes 1 through 6 of this Plan, inclusive, have been paid in full, and Class 8 will not receive or retain any property on account of their Equity Interests; and (ii) the Presumed Rejecting Class because the Holders in that Presumed Rejecting Class are not receiving or retaining any property on account of their Equity Interests and there is no Class below Class 8.  Based on the foregoing, the requirements of section 1129(b) of the Bankruptcy Code are met with respect to Class 4 and the Rejecting Classes, and the Plan may be confirmed notwithstanding the lack of votes for or against the Plan by Class 4, rejection of the Plan by the Rejecting Class and the deemed rejection by the Presumed Rejecting Class, respectively.

NN.   <u>Only One Plan (11 U.S.C. § 1129(c))</u>.   The Plan is the only plan filed in these Chapter 11 Cases. Accordingly, section 1129(c) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

OO.   <u>Principal Purpose of the Plan (11 U.S.C. § 1129(d))</u>.   The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933, thereby satisfying the requirements of section 1129(d) of the Bankruptcy Code.

PP.   <u>Small Business Case (11 U.S.C. § 1129(e))</u>.   None of the Chapter 11 Cases are "small business case[s]," as that term is defined in the Bankruptcy Code. Accordingly, section 1129(e) of the Bankruptcy Code is inapplicable.

## ADDITIONAL FINDINGS

QQ.   <u>Good-Faith Solicitation (11 U.S.C. § 1125(e))</u>.   Based on the record before the Court in these Chapter 11 Cases, the Epiq Declaration, the Rankin Declaration, and the Ballot Report, the Debtors have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation.

RR.   <u>Satisfaction of Confirmation Requirements</u>.   Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

SS.   <u>Implementation</u>.   All documents necessary to implement the Plan, including all other relevant and necessary documents have been negotiated in good faith and at arm's length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and not be in conflict with any federal or state law.

TT.    <u>Good Faith of the Plan Proponents</u>.  The Debtors, and all of their respective current directors, managers, officers, members, equity holders, employees, agents, financial advisors, partners, attorneys, other professional advisors (including, but not limited to, the Chief Restructuring Officer) and representatives (i) have acted in good faith in negotiating, formulating, and proposing the Plan and related agreements, compromises, settlements, transactions and transfers contemplated thereby, and (ii) will be acting in good faith in proceeding to (a) consummate the Plan and the agreements, compromises, settlements, transactions, and transfers contemplated thereby, (b) implement the Insurance Settlement Agreements, and (c) take the actions authorized and directed or contemplated by the Plan and/or this Confirmation Order.

UU.    <u>Executory Contracts and Unexpired Leases</u>.  The Debtors have satisfied the provisions of section 365 of the Bankruptcy Code with respect to the rejection of Executory Contracts pursuant to Article XI of the Plan.

VV.    <u>Transfers by Debtors</u>.  All transfers of property and assets of the Debtors' Estates to the Liquidating Trust and Tort Claims Trust, respectively, shall be free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as otherwise provided in the Plan or this Confirmation Order.

WW.    <u>Vesting of Assets</u>.  Except as provided in the Plan, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors, including the Excluded Assets but excluding the Tort Claims Trust Assets, shall vest in the Liquidating Trust, and the Tort Claims Trust Assets shall vest in the Tort Claims Trust, in each case free and clear of all Claims, Liens, liabilities, encumbrances, charges and other interests, including, without limitation, any and all Claims, Liens, encumbrances and any and all right, title, and interests related thereto of

governmental entities relating to any tax liabilities or similar liabilities. Such vesting does not constitute a voidable transfer under the Bankruptcy Code or applicable non-bankruptcy law.

XX. <u>Injunction, Exculpation, and Releases</u>. The Court has jurisdiction under sections 1334(a) and (b) of title 28 of the United States Code to approve the injunctions, exculpations, and releases set forth in Article XIII of the Plan, because, *inter alia*, these provisions are an integral part of the Plan. Moreover, the approval of the injunctions, exculpations, and releases set forth in Article XIII of the Plan are core matters under section 157 of title 28 of the United States Code because, *inter alia*, these provisions arise in the context of confirmation of the Plan and are integral parts of the Plan. Section 105(a) of the Bankruptcy Code permits issuance of the injunctions and approval of the releases set forth in Article XIII of the Plan if, as has been established in these Chapter 11 Cases based upon the record in the Chapter 11 Cases, the Disclosure Statement, the Rankin Declaration, and the evidence presented at the Confirmation Hearing, such provisions (i) were integral to the agreement among the various parties in interest and are important and necessary to the formulation and implementation of the Plan, as provided in section 1123 of the Bankruptcy Code, (ii) confer substantial benefits on the Debtors' Estates and creditors, (iii) are fair and reasonable and/or are justified based upon the unusual circumstances of these Chapter 11 Cases, and narrowly tailored to same, and (iv) are in the best interests of the Debtors, their Estates, and all parties in interest. The Debtor Release is limited in scope, and granting it represents a valid exercise of the Debtors' business judgment, is in the best interests of the Estates, and falls well above the lowest point in the range of reasonableness. The Debtor Release does not release the Purchaser's obligations under the Asset Purchase Agreement, the Global Settlement Term Sheet, the Sale Order or any other documents executed by the Purchaser at the Closing. Nor does the Debtor Release release Claims or Causes of Action related to the D&O Liability Insurance Policies

against any former directors and officers who are not Released Parties. And to be clear, none of the release provisions in Section 13.7 of the Plan, including the Debtor Release, constitute a non-consensual third-party release. In the Rankin Declaration, Mr. Rankin, the Debtors' CRO, testified, *inter alia,* as to his belief that the Debtor Release:

> "[I]s an integral part of the … Plan and was required in order to induce the Debtors, the Insurance Settlement Released Parties and various parties to support the … Plan.  The Debtor Releases are supported by adequate consideration given by the Purchaser, the Senior DIP Parties, the Junior DIP Parties, and the Junior DIP Agent pursuant to the Global Settlement Term Sheet.  Confirmation of the … Plan would not be possible but for the Purchaser's agreement to (i) increase the amount of the Assumed Liabilities under the Asset Purchase Agreement; (ii) provide the Additional DIP Financing; and (iii) provide the Plan Cash necessary to fund the Liquidating Trust. Moreover, the Senior DIP Lender has agreed to limit its Senior DIP Deficiency Claim in Class 2 to the reasonably documented unreimbursed fees and expenses not to exceed $1,000,000."

Rankin Declaration, ¶ 30(c)(i). Mr. Rankin further testified that "[t]he Debtor Release was negotiated in connection with the Global Settlement Term Sheet and the Insurance Settlement Agreements, is an essential component of the … Plan, and constitutes a sound exercise of the Debtors' business judgment." *Id.*  Regarding the exculpation provisions, Mr. Rankin testified, *inter alia*, that:

> I understand that the Exculpated Parties participated in good faith and played critical roles in the Debtors' Chapter 11 Cases, including involvement in arm's length negotiation of the Second Amended Plan, Disclosure Statement, solicitation of votes for and pursuit of confirmation of the Second Amended Plan, all of which participation will facilitate a successful restructuring. I further understand that this participation was undertaken with the expectation that the Second Amended Plan would include exculpation provisions to protect those who, like the Exculpated Parties, contributed to the Debtors' liquidation process, from collateral attacks related to any good faith acts or omissions related to the Debtors' liquidation. I further understand that all of the Exculpated Parties have provided significant contributions in the Debtors' Chapter 11 Cases which have been critical to the success of the Debtors' liquidation process, including, but not limited to, agreeing to a sale of substantially all of the assets of the Debtors and the Global Settlement Term Sheet which is intertwined therein.

27

*Id.*, ¶ 30(f).  Further, the release and exculpation provisions in the Plan are subject to certain carve-outs (Sections 13.7(b) and 13.8)) that do not relieve any party of, among other things, liability for an act or omission to the extent such act or omission is determined by a final order by a court of competent jurisdiction to have constituted fraud, willful misconduct or gross negligence or the other exceptions set forth therein, and do not release any Retained Causes of Action.  Pursuant to section 1123(b)(3) of the Bankruptcy Code, the releases, exculpations, and injunctions set forth in Article XIII of the Plan and implemented by this Confirmation Order are fair, equitable, reasonable, and in the best interests of the Debtors and their Estates, creditors, and equity holders.  The failure to include such provisions would seriously impair the Debtors' ability to confirm the Plan in these Chapter 11 Cases.  Based upon the record of these Chapter 11 Cases and the evidence proffered or adduced in support of confirmation of the Plan, and the Court noting that the U.S. Trustee does not object to Section 13.7 of the Plan,  this Court finds that the injunctions, exculpations, and releases set forth in Article XIII of the Plan are consistent with the Bankruptcy Code and applicable law.

YY.     <u>Insurance Settlement Agreements; Channeling Injunction and Bar Order</u>. The Court incorporates in full its oral ruling provided on the record on July 29, 2024.  The Court has reviewed, among other things, the Supreme Court's ruling in *Purdue,* the parties' *Purdue* Briefs, and the decisional law cited therein.  The Court has jurisdiction under sections 1334(a) and (b) of title 28 of the United States Code to approve the Insurance Settlement Agreements, including specifically the Channeling Injunction and Bar Order in connection therewith, as set forth in Article XIII of the Plan, because, *inter alia*, these provisions are an integral part of the Debtors' Plan.  Approval of the Insurance Settlement Agreements is appropriate pursuant to sections 105(a), 363, and 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, including because the Insurance Settlement Agreements fall well above the lowest point in the range of reasonableness and meet the standards

for approval of settlements set forth in *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.),* 898 F.2d 1544, 1549 (11th Cir. 1990). The Bar Order and Channeling Injunction are fair and equitable because they also satisfy the factors set forth in *Matter of Munford, Inc.*, 97 F.3d 449 (11th Cir. 1996) ("Munford"). Such factors include: (1) "the interrelatedness of the claims that the bar order precludes"; (2) "the likelihood of the non-settling defendants to prevail on the barred claim"; (3) "the complexity of the litigation"; and (4) "the likelihood of depletion of the resources of the settling defendants." *Id.* at 455. Under *Munford*, a bankruptcy court should also consider whether the bar order is essential or integral to the proposed settlement, that is, whether the settling parties would have entered into the settlement without the benefit of a bar order, and whether the settlement is fair and equitable. *Id.* As established at the Confirmation Hearing, none of the Insurance Settlement Released Parties would have entered into the Insurance Settlement Agreements absent entry of the Channeling Injunction and the Bar Order rendering both essential and integral to the Plan. Applying the *Munford* factors here, the Tort Claims, whether asserted directly against the Debtors and/or the Municipalities, are clearly interrelated. As the Court has recognized throughout these Chapter 11 Cases, a Tort Claim against a Municipality, whether or not the Debtors are joined, is effectively a Tort Claim against the Debtors because there is an obligation by the Debtors to indemnify the Municipalities pursuant to the permits to operate in the applicable Municipalities. Moreover, both Tort Claims against the Debtors and against the Municipalities share the same insurance coverage, as named insureds or beneficiaries, such that a Tort Claim against a Municipality or the Debtors share coverage in a similar fund to the extent of available insurance. Related to this issue is the fact that the Debtors do not have the funds necessary to satisfy the self-insured retention obligations on their insurance policies ("SIR"). Also, the Claims of the Municipalities against the Debtors for indemnification are interrelated with the arbitration and

indemnification obligations that are owed by each scooter rider to the Debtors and the Municipalities pursuant to the Bird and/or Spin terms of use agreed to by a rider when such rider chooses to ride a Bird or Spin scooter. Next, the likelihood that the Tort Claimants will prevail on their barred Tort Claims is very much uncertain. There exist significant defenses to liability by the Debtors, the Municipalities, and the Insurers. For example, in many, if not most of the Tort Claims asserted, there are contributory negligence issues, such as riding without a helmet, riding while intoxicated, etc. which could bar or greatly limit any potential recovery. Litigation over the Debtors' or Municipalities' liability with respect to the Tort Claims would be lengthy, complex, and costly with the costs of litigation in over two hundred personal injury cases. These cases are complex and involve multiple issues with liability, including contributory negligence, apportionment of fault, etc. with no guarantee that the Tort Claimants would ultimately prove liability or obtain a judgment against the Debtors and/or the Municipalities. Even if holders of Tort Claims were ultimately able to establish liability vis-à-vis the Debtors or other Insurance Settlement Released Parties, such a process would: (a) delay—likely by years—money getting to Tort Claimants and (b) materially reduce recoveries due to litigation costs (even if in the form of contingency fees). Indeed, many of these cases have been in the tort system for years already. Moreover, the Tort Claimants would have to prevail in two layers of litigation, *i.e.,* they would need to prevail on their Tort Claims and then either the Debtors, or their designees, would have to succeed in establishing insurance coverage for that liability. Also, the issue of whether an SIR must be met, and by whom, before coverage is provided is complex, that is, it will necessarily include an analysis of the Insurance Policies, the SIR applicable to each Tort Claimants' Claim, the Debtors' ability, if at all, to satisfy the SIR, and conflicting caselaw in the absence of a controlling published Eleventh Circuit decision to guide the Court's analysis. All of this protracted litigation, including arbitrability and coverage litigation,

30

would without question result in increased costs, reducing the funds available for distribution to Tort Claimants, making it highly unlikely that the result of such litigation would be more favorable than the proposed terms of the Insurance Settlement Agreements. Finally, there is no doubt that the Debtors lack the funds necessary to satisfy the Tort Claims, or even defend the Tort Claims, and any further litigation would cause all remaining assets to be depleted. The Debtors similarly do not have the funds to litigate coverage issues with the Insurers or defend claims related thereto. As a result, the Court is satisfied that the proposed Insurance Settlement Agreements set forth in the Plan, including the required Bar Order and Channeling Injunction in connection therewith, are both fair and equitable. The Insurance Settlement Agreements provide for the Tort Claims Trust to be funded in the approximate amount of $19.2 million, which is a substantial increase from the prior, pre-Judicial Settlement Conference figure of $12 million, Rankin Declaration, ¶ 24, and based on the evidence adduced at the Confirmation Hearing, discussed below, is an amount which the Court finds is sufficient to fairly and equitably make distributions in full on account of the allowed Tort Claims. In the Safon Declaration and in court, Brad J. Safon, an expert witness retained by Underwriters whom the Court found to be credible, testified, *inter alia*, about his review and valuation of claims which have been identified as the most significant claims and/or those which have asserted the highest demands as a sample of the balance of the various personal injury claims against the Debtors and/or the Municipalities. Safon Declaration, ¶¶ 19-50. In short, based on his thirty-two (32) years of litigation experience in product liability cases and nine (9) years mediating approximately 1,000 cases, Mr. Safon testified that he analyzed documents and information regarding the most significant Tort Claims asserted in these Chapter 11 Cases and concluded that such proofs of claim assert amounts far greater than their likely settlement value. *See id.*, ¶¶ 8-18, 51. The Court considered a *Daubert* motion by the California Plaintiffs to exclude Mr. Safon's

expert testimony and the Safon Declaration. The Court concluded that the testimony of Mr. Safon and his declaration would be admitted and the Court would decide, in its gatekeeper role, how much weight to give to his testimony. The Court determined that Mr. Safon was credible and his testimony would be helpful in determining the issues with respect to the Plan and the Insurance Settlement Agreements. While Mr. Safon did not have complete or perfect information about the Tort Claims he analyzed, he had sufficient information about the Tort Claims to help the Court canvass the issues in those cases and the Tort Claims generally. There was no expert testimony nor rebuttal expert testimony provided by the Objectors. Instead, the Court considered the California Plaintiffs' Declarations, which were made by counsel to the California Plaintiffs, setting forth their belief, based on their experience as personal injury attorneys, as to the value of their clients' respective Tort Claims. The Court also considered the testimony of the personal injury attorneys for the California Plaintiffs. All of the personal injury attorneys for the California Plaintiffs testified and/or stipulated that they each have a contingency fee arrangement with their clients in the range of 33% to 45% of their clients' recovery, exclusive of, and in addition to, any litigation costs or expenses. The California Plaintiffs' Declarations did not acknowledge any potential defenses to their Tort Claims based on a variety of causation factors, such as contributory negligence. However, at the Confirmation Hearing, the California Plaintiffs' attorneys did acknowledge that their estimates could be high, could be low, or the Tort Claimants could recover nothing based on defenses that could be asserted by the Debtors or the Municipalities. Both the testimony and declarations by Mr. Safon and the California Plaintiffs make clear to the Court that there are a multitude of issues to consider in approving a settlement. Both reflect a subjective analysis of the value of the Tort Claims based upon their experience in dealing with such claims. Fortunately, the Court was provided with the Rankin Declaration which set forth the historical claims, litigation and

settlement data of the Debtors spanning 2018 through 2023, which was maintained in the ordinary course of business by the Debtors' in-house legal department, the Debtors' claims administrator, Broadspire Service, Inc., and outside counsel retained by the Debtors to defend tort litigation. Rankin Declaration, ¶ 30(c)(iv). Mr. Rankin formed the view based on the historical claims resolution information for the past six (6) years, that the funds contributed to the Tort Claims Trust for the benefit of Tort Claimants would sufficiently fund the Tort Claims Trust to resolve all asserted Tort Claims. *Id.* Exhibit "1" to the Rankin Declaration reflected the demands made and ultimate settlements paid by the Debtors or their insurers on account of claims asserted and lawsuits filed by three-hundred and forty-eight (348) Settled Tort Claimants (as defined in the Rankin Declaration) against the Debtors and/or Municipalities from 2018 through 2023. *Id.* Notwithstanding that the demands made by the Settled Tort Claimants totaled about $90.8 million in the aggregate, the Settled Tort Claimants ultimately received approximately $12.7 million in settlement of those claims. *Id.* The demands of the Settled Tort Claimants ranged from very small claims to very large claims, including a claim with a demand of $18,000,000. *Id.* As further reflected on Exhibit "1" to the Rankin Declaration, the lowest settlement payment totaled $0, the highest settlement payment totaled $3,000,000 and the average settlement payment totaled $36,567.62 (calculated by dividing $12,725,532.40 by the 348 Settled Tort Claimants). *Id.* If each of the 204 Tort Claims in this case were settled at the average settlement payment in the past six (6) years (*i.e.*, $36,567.62), that would result in a total payment of $7,459,794.48 by the Tort Claims Trust. In fact, even if the average settlement payment were doubled (*i.e.*, $73,135.24), that would result in a total payment of $14,919,589.00 by the Tort Claims Trust. Obviously, there will be some Tort Claims which warrant a larger distribution from the Tort Claims Trust, but the Court is satisfied that the historical claim information indicates that the $19.2 million to be contributed sufficiently

funds the Tort Claims Trust to resolve and provide for payment in full of all asserted Tort Claims that are ultimately allowed. At bottom, the historical claims data in the Rankin Declaration provides the Court with concrete, objective information from which the Court can understand and consider the ranges of settlements over a substantial period of time (six (6) years)—the life of the Bird Debtors. Additionally, in the Beckett Declaration, Ian Beckett, the claims manager for Apollo Syndicate Management Limited, testified, *inter alia*, that "[t]here have been no claims with a date of loss occurring after February 1, 2020 that have resulted in any settlement, judgment, or payment in excess of an applicable SIR which ranged from $250,000.00 to $1,000,0000." Beckett Declaration, ¶ 9. Mr. Beckett further testified that:

> As a material term and negotiation of the Underwriters' Insurance Settlement Agreement, Apollo required the inclusion of a Bar Order and Channeling Injunction as set forth in the Plan. As the municipalities assert insured status, Underwriters cannot get finality and complete relief in the absence of th[ese] key terms;

*Id.*, ¶ 10. Mr. Beckett also testified that:

> The Bar Order and the Channeling Injunction are both an integral and mandatory part of Apollo's agreement to compromise and pay the Settlement Amounts, and without which there would be no agreement to fund the Insurance Settlement Proceeds and/or advance additional funds on behalf of the Purchaser in the amount of $2M. To be clear, without the entry of a Final Order approving the Bar Order and Channeling Injunction, the Underwriters' Insurance Settlement Agreement will not be consummated by Apollo.

*Id.*, ¶ 11. For his part, Mr. Rankin testified, *inter alia,* that "the Channeling Injunction is an integral and essential part of the Second Amended Plan and was required in order to induce the Insurance Settlement Released Parties to contribute the substantial amounts as set forth in the Insurance Settlement Agreements." Rankin Declaration, ¶ 30(c)(ii). Mr. Rankin further testified that based upon his participation in the Debtors' Chapter 11 Cases, he believed "the Bar Order is an integral and essential part of the Second Amended Plan and was required in order to induce the Insurance Settlement Released Parties to contribute $19.2 million to fund the Tort Claims Trust." *Id.*

34

Moreover, Mr. Rankin believed that "the Channeling Injunction and the Bar Order facilitate a comprehensive process for resolving Tort Claims in a speedy, transparent, and fair manner" and that the "Tort Claims in the Tort Claims Trust will be evaluated on the basis of clear, evidence-based criteria, to determine compensability pursuant to the Tort Claim ADR Procedures." *Id.* In the Washinushi Declaration, Mr. Washinushi, the co-chief executive officer of the Purchaser, and Debtors' former CEO, testified, *inter alia*, that:

> In exchange for funding the Purchaser's Contribution [$2 million of the Insurance Settlement Proceeds], the Purchaser requires that the Bar Order and the Channeling Injunction set forth in the Underwriters' Insurance Settlement Agreement be granted and approved by the Court, including in favor of the Purchaser and the Municipalities. The Bar Order and the Channeling Injunction are an integral and mandatory part of the Underwriters' Insurance Settlement Agreement from the perspective of the Purchaser. To that end, if the Bar Order and the Channeling Injunction were not part of the benefits to the Purchaser and the Municipalities, among others, under the Underwriters' Insurance Settlement Agreement and the Second Amended Plan, then the Purchaser would not have agreed to fund the Purchaser's Contribution.

Washinushi Declaration, ¶ 12. The foregoing unrefuted evidence, and all other evidence adduced at the Confirmation Hearing by the Debtors, the Settling Insurers, and the Municipalities, among others, supports approval of the Insurance Settlement Agreements, including issuance of the Channeling Injunction and the Bar Order, as an exercise of sound business judgment by the Debtors which is in the best interests of the Debtors' Estates and their Creditors, including the Tort Claimants. The Insurance Settlement Agreements, including the Channeling Injunction and the Bar Order set forth in Article XIII of the Plan and implemented by this Confirmation Order are fair, equitable, reasonable, and in the best interests of the Debtors and their Estates, the Tort Claimants, other Creditors, and equity holders. Based upon the record of these Chapter 11 Cases and the evidence proffered or adduced in support of confirmation of the Plan, this Court finds that the

Channeling Injunction and the Bar Order set forth in Article XIII of the Plan are consistent with the Bankruptcy Code and applicable law.

ZZ.    <u>Sales of Insurance Policies</u>.  The Insurance Settlement Agreements contemplate that the each of the Settling Insurers' Policies will be sold back to each respective Settling Insurer in free and clear sales under Section 363 of the Bankruptcy Code.  Property of the estate may be sold outside of the ordinary course of business.  *See* 11 U.S.C. § 363(b).  "[D]ebtors who wish to utilize § 363(b) to dispose of property of the estate must demonstrate that such disposition has a valid business justification." *240 N. Brand Partners, Ltd. v. Colony GFP Partners, L.P. (In re 240 N. Brand Partners, Ltd.)*, 200 B.R. 653, 659 (B.A.P. 9th Cir. 1996).  "In addition to proving that the proposed sale has a valid business justification, the debtor must also show that the sale is proposed in good faith." *Id.*  To sell property of the estate free of all interests, one of the following conditions must be satisfied: (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f).  The Debtors have demonstrated that the proposed Insurance Settlement Agreements which provide for the sales of the Settling Insurers' Policies have a valid business justification and are being proposed in good faith.  The sales resolve the insurance coverage disputes that risk leaving some or potentially all of the Tort Claimants with no access to insurance proceeds and without any entity providing overarching administration of Tort Claims for the benefit of the Debtors' Tort Claimants.  The sales will effectuate the orderly administration of Tort Claims in accordance with the Plan, and Tort Claim ADR Procedures including allowing Tort Claimants to pursue other co-defendants for recovery on their Tort Claims

where appropriate.  The proposed sales were negotiated in good faith at arm's length by sophisticated counsel.  The proposed sales are supported by valuable consideration, including the prompt payment of $19,216,036.50.  Moreover, grounds exist to sell the Settling Insurers' Policies free and clear of all interests under 11 U.S.C. §§ 363(f)(1), (2), and (5).  In fact, supplemental injunctions have been upheld in the precise scenario present here: the sale of insurance policies back to insurers pursuant to Sections 363(b) and (f) of the Bankruptcy Code.  *See*, *e.g.*, *In re Roman Catholic Bishop of Stockton*, No. 14-20371, 2017 WL 118013, at *8-9 (Bankr. E.D. Cal. Jan. 10, 2017); *In re Sunland, Inc.*, WL 7011747 (Bankr. D.N.M. Dec. 11, 2014).  Courts have noted that supplemental injunctions under Section 105(a) are permissible in aid of other provisions of the Code such as Section 363(f).  *See*, *e.g.*, *In re Roman Catholic Bishop of Stockton*, 2017 WL 118013, at *9; *In re Sunland, Inc.*, 2014 WL 7011747, at *5.  Applying a business judgment standard, bankruptcy courts have approved insurance policy "buy-backs" (such as those contemplated under the Insurance Settlement Agreements) under Sections 363(b) and (f) of the Bankruptcy Code. *See, e.g.*, *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 93 (2d Cir. 1988) (affirming bankruptcy court "authority to approve the settlements and to channel claims arising under the policies to the proceeds of the settlement"); *In re Dow Corning Corp.*, 198 B.R. 214, 222 n.7 (Bankr. E.D. Mich. 1996) (proper test for approval of insurance settlements under either Bankruptcy Rule 9019 or section 363(b) of the Bankruptcy Code is the business judgment standard); *In re Congoleum Corp.*, 627 B.R. 62, 70 (Bankr. D.N.J. 2021); *In re Flintkote Co.*, No. 04-11300, 2012 Bankr. LEXIS 6006, at *77-84 (Bankr. D. Del. Dec. 21, 2012) (listing orders approving policy buybacks in advance of confirmation of the plan in case involving numerous asbestos claims); *In re CFB Liquidating Corp.*, No. 01- 5483 (RLE), 2012 WL 3929289, at *8-14 (Bankr. N.D. Cal. Sep. 7, 2012) (order confirming plan involving insurance buybacks with several insurers in asbestos case); *In re Jensen Farms et*

*al.*, No. 12-20982 HRT (Bankr. D. Colo. Oct. 25, 2012) [ECF No. 185] (approving buyback of policy in case involving listeria outbreak and wrongful death suits); *In re Roman Catholic Archbishop of Portland in Oregon*, No. 304-37154 (ELPL) 1 (Bankr. D. Ore. Feb. 2, 2007) (orders approving policy buybacks in advance of plan by several insurers in case involving numerous sex-abuse claims); *In re Delaco Co.*, No. 04-10899 (Bankr. S.D.N.Y. July 29, 2005 & Aug. 1, 2005) (orders approving policy buybacks in advance of plan by several insurers in case involving numerous product liability suits). Moreover, courts in these circumstances have recognized that the Settling Insurers are good faith purchasers within the meaning of Section 363(m) of the Bankruptcy Code. The same conclusion applies here. The Court finds pursuant to Section 363(m) that the Settling Insurers are good faith purchasers. No Objector challenged this finding or asserted that the Settling Insurers are not good faith purchasers. The Settling Insurers have agreed to make substantial contributions towards the Tort Claims Trust – amounts that could far exceed their obligations if the Settling Insurers were successful in asserting their coverage defenses. The Insurance Settlement Agreements were each negotiated in good faith and at arm's length and are not collusive or the product of fraud or misconduct. *See, e.g., In re Stanford*, 17 F.4th 116, 125 (11th Cir. 2021) (affirming good faith determination under section 363(m) where the bankruptcy court found that the sale process and sale were non-collusive, fair and reasonable, and conducted at arm's length). The Debtors' decision to sell the Settling Insurers' Policies is based upon sound business judgment. The combined amount of the Insurance Settlement Proceeds is fair and reasonable consideration for the sales of the Settling Insurers' Policies. Also, in light of the uncertainty of coverage liability, as well as the necessary delay and cost of proving liability, settlement is preferable and a better business decision compared to a case-by-case adjudication of coverage for each Tort Claim. In the exercise of its business judgment, the Debtors have determined

that selling the Settling Insurers' Policies within the context of the Insurance Settlement Agreements is in the best interests of the Estates and its creditors, including the Tort Claimants. The proceeds from the sales of the Settling Insurers' Policies will be used as provided in the Insurance Settlement Agreements, including the administration and payment of the Tort Claims.

AAA.    <u>Arbitration / Jury Trial</u>.  As set forth in the Rankin Declaration, each rider of a Bird or Spin vehicle rented and had use of the scooter only through the Bird or Spin app, as applicable. Rankin Declaration ¶ 30(c)(ii).  Each rider was required to agree to the relevant terms of use *before* the rider is able to unlock and use a Bird or Spin vehicle.  *Id.*  In fact, the scooter is inoperable unless the rider accepts the terms of use on the app.  *Id.*  The Bird and Spin terms of use include agreements to arbitrate disputes and waivers of jury trial rights.  *Id.*  A rider has 30 days from the date he or she accepts the terms of use within which to opt out of the arbitration provisions contained in the terms of use by delivering a letter to Bird advising of the rider's decision to opt out.  *Id.*  No Objector introduced evidence at the Confirmation Hearing that he or she did not agree to the terms of use, or evidence that he or she opted out of such terms of use.  As such, the Court finds that riders, including the Objectors, have agreed to the terms of use which include an agreement to arbitrate disputes and waived jury trial rights.  The California Plaintiffs asserted at the Confirmation Hearing that, notwithstanding their agreement to arbitrate disputes, the Municipalities did not assert such arbitration rights and therefore they retain a right to a jury trial.  The Debtors and the Municipalities dispute this contention.  The Court need not address these arguments now as the Tort Claim ADR Procedures remain subject to Court approval on a motion by the Tort Claims Trustee, with notice to the Tort Claimants and a hearing.  The Court required the parties to meet and discuss the ADR Procedures prior to finalizing same.

BBB. <u>Preservation of Causes of Action</u>.  It is in the best interests of the Debtors, their creditors, and holders of Interests in the Debtors that the Debtors preserve the Retained Causes of Action as set forth in the Plan and Exhibit 6 thereto.

CCC. <u>Liquidating Trust is Not a Successor to the Debtors</u>.  Except with respect to the payment of the Claims expressly provided for in Articles II – III of the Plan and the rights provided to the Liquidating Trust (including, but not limited to the Retained Causes of Action), the Liquidating Trust shall not be the successor to the Debtors and their Estates.  Except with respect to the rights of the Liquidating Trust expressly provided for in the Plan (including, but not limited to, the investigation and pursuit of the Retained Causes of Action), the Liquidating Trust and this Confirmation Order, (i) the Liquidating Trust shall not assume, incur or be responsible for any claims or liabilities of the Debtors or any of their affiliates, and (ii) the Liquidating Trust shall not be, nor deemed to be, successors or successors in interest of the Debtors, nor incur any successor or transferee liability of any kind, nature or character, including, without limitation, in relation to (a) any and all liabilities arising or resulting from or relating to the transactions contemplated by the Plan, (b) any and all Claims, Liens, liabilities, encumbrances, charges and other interests arising from or relating to any conduct, liabilities, or obligations of the Debtors, and (c) any and all Claims, Liens, liabilities, encumbrances, charges and other interests and any and all right, title, and interests related thereto, of governmental entities relating to any tax or similar liabilities.

DDD. <u>The Tort Claims Trust is Not the Same Legal Entity as the Debtors</u>. On the Confirmation Date, the Tort Claims Trust shall be established pursuant to the Tort Claims Trust Agreement and the Trust Documents. The Tort Claims Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" pursuant to Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder.  The Debtors are the "transferor"

within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Tort Claims Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3). The Tort Claims Trust shall not be deemed to be the same legal Entity as the Debtors, but only the assignee of certain assets of the Debtors and a representative of the Estates for delineated purposes within the meaning of Section 1123(b)(3) of the Bankruptcy Code.

## CONCLUSIONS OF LAW

NOW, THEREFORE, BASED ON THE ABOVE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.     <u>Adequate Information</u>.   The Disclosure Statement (i) contains "adequate information" (as such term is defined in section 1125(a)(1)) with respect to the Debtors, the Plan, and the transactions contemplated therein, including the Insurance Settlement Agreements, and (ii) is approved on a final basis.

2.     <u>Confirmation of the Plan and Approval of the Insurance Settlement Agreements</u>. All requirements for confirmation of the Plan have been satisfied. Accordingly, the Plan in its entirety (as modified by the terms hereof) is **CONFIRMED** pursuant to section 1129 of the Bankruptcy Code. The terms of the Plan are incorporated by reference into, and are an integral part of, this Confirmation Order. The Insurance Settlement Agreements (including the Channeling Injunction, the Bar Order and each of their other respective terms) are approved pursuant to Bankruptcy Rule 9019, Sections 105(a), 363, and 1123(b) of the Bankruptcy Code and applicable law, including specifically the Eleventh Circuit's decision in *Munford*. The Court accordingly orders that the Settling Insurers' Policies shall be sold by the Debtors to the applicable Settling Insurer free and clear of all interests as of the Effective Date. The Court fully incorporates its findings of fact and conclusions of law as set forth on the record in the Confirmation Hearing.

3.    <u>Objections</u>.  All parties in interest have had a full and fair opportunity to litigate all issues raised, or which could have been raised, by the Objections, to the extent not withdrawn or resolved prior to the Confirmation Hearing, and the Objections have been fully and fairly litigated. The Objections and all other objections (informal or otherwise), responses, statements, and comments in opposition to the Plan (including opposition raised in the *Purdue* Briefs), other than those withdrawn in their entirety prior to the Confirmation Hearing or otherwise resolved on the record of the Confirmation Hearing and/or herein, are overruled.

4.    <u>Plan Documents</u>. The Plan, and any amendments, modifications, and supplements thereto, and any other documents and agreements provided by the Debtors in support of confirmation of the Plan (including all exhibits and attachments thereto and documents referred to therein) (collectively, the "<u>Plan Documents</u>"), and the execution, delivery, and performance thereof by the Debtors, the Liquidating Trustee, and the Tort Claims Trustee as the case may be, are authorized and approved when they are finalized, executed and delivered, and are integral to, part of and are incorporated by reference into the Plan.  Without further order or authorization of this Court, the Debtors, the Liquidating Trustee, and Tort Claims Trustee and their respective successors are authorized and empowered to make all modifications to all Plan Documents that are consistent with the Plan.  Execution versions of the documents comprising the Plan Documents shall constitute legal, valid, binding, and authorized obligations of the respective parties thereto, enforceable in accordance with their terms.

5.    <u>Solicitation and Notice</u>.  Notice of the Confirmation Hearing complied with the terms of the Conditional Approval Order, was appropriate and satisfactory based on the circumstances of these Chapter 11 Cases and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  The solicitation of votes on the

Plan and the Solicitation Materials complied with the solicitation procedures in the Conditional Approval Order, was appropriate and satisfactory based upon the circumstances of these Chapter 11 Cases and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Notice of the Plan, the Insurance Settlement Agreements (including the Channeling Injunction and the Bar Order therein) and all related documents, was appropriate and satisfactory based upon the circumstances of these Chapter 11 Cases, was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice thereof is necessary or required, including to bind all parties in interest thereto.

6.      <u>Omission of Reference to Particular Plan Provisions</u>.  The failure to specifically describe or include any particular provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Plan be approved and confirmed in its entirety.

7.      <u>Plan Classification Controlling</u>.  The classifications of Claims and Interests for purposes of the distributions to be made under the Plan shall be governed solely by the terms of the Plan.  The classification set forth on the Ballots tendered or returned by the Debtors' creditors in connection with voting on the Plan were set forth on the Ballots solely for purposes of voting to accept or reject the Plan.

8.      <u>Binding Effect</u>.  Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, upon entry of this Confirmation Order and subject to the occurrence of the Effective Date, the provisions of the Plan, including specifically the terms of the Insurance Settlement Agreements and the Channeling Injunction and the Bar Order therein, shall bind (i) any Holder of a Claim (including, for avoidance of doubt, Tort Claims) against or Interest in the Debtors and their respective successors and assigns, whether or not such Claim (including Tort

43

Claims) or Interest of such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan, (ii) any and all non-debtor parties to assumed or rejected Executory Contracts with the Debtors, (iii) those parties who objected to the Plan or provided informal objections or comments to the Plan, (iv) every other party in interest in these Chapter 11 Cases, and (v) all parties receiving property under the Plan, and their respective heirs, executors, administrators, successors, or assigns.

9.      <u>Liquidating Trust Agreement; Ratification of Liquidating Trustee</u>.  The Liquidating Trust Agreement is hereby approved in all respects.  The Debtors and Liquidating Trustee are hereby directed to execute the Liquidating Trust Agreement.  The selection of Joseph J. Luzinski of Development Specialists, Inc. as Liquidating Trustee is hereby ratified.

10.      <u>Tort Claims Trust; Ratification of Tort Claims Trustee</u>. The Tort Claims Trust is hereby approved in all respects.  The Debtors and the Tort Claims Administrator are hereby directed to execute the Tort Claims Trust Agreement.  The selection of Robert Fishman of the Algon Group as Tort Claims Trustee is hereby ratified.

11.      <u>Dissolution of the Corporate Existence of the Debtors</u>.  Pursuant to and in accordance with Section 5.4 of the Plan, effective as of immediately prior to the Effective Date, automatically and without further action, each existing member of the Debtors' board of managers or directors of the Debtors, as applicable, will be deemed to have resigned or to have been terminated without cause and, on and after the Effective Date, the Liquidating Trustee, in substitution for the management and the board of managers, shall be authorized and empowered to act for the Debtors and take any and all actions the Liquidating Trustee may determine in his business judgment to implement, effectuate, consummate and perform pursuant to the Plan or this Confirmation Order as reasonably necessary to implement the Plan and wind up the Debtors.

Section 6.6(d) of the Plan provides that, on and after the Effective Date, the Liquidating Trustee shall take commercially reasonable actions to dissolve, liquidate, strike off or take such similar action with respect to each Debtor, including cancellation of all Interests in a Debtor pursuant to this Confirmation Order, and complete the winding down of such Debtor as expeditiously as practicable without the need for any further actions to be taken by or for the Debtor or its shareholders or members, or any payments to be made subject to the filing of a certificate of dissolution.

12.    The Liquidating Trust Assets.  On the Effective Date, the Debtors shall be deemed to have automatically transferred to the Liquidating Trust all title and interest in all of the Excluded Assets, which includes the Retained Causes of Action, and in accordance with section 1141 of the Bankruptcy Code, all such Excluded Assets, including the Retained Causes of Action, shall irrevocably and automatically vest in the Liquidating Trust free and clear of all liens, Claims, charges, or other encumbrances, and Interests (legal, beneficial or otherwise) for the benefit of the Liquidating Trust Beneficiaries.  In connection with the vesting and transfer of the Retained Causes of Action, any attorney-client privilege, work-product privilege, common interest privilege, or any other legal privilege or immunity attaching to any documents, information, or communications (whether written or oral) transferred to the Liquidating Trust shall vest in the Liquidating Trust and its representatives.  The Debtors and the Liquidating Trustee are authorized and directed to take all necessary actions to effectuate the transfer of such privileges.  Upon the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Debtors shall have no interest in or with respect to the Liquidating Trust Assets or Liquidating Trust.  Upon delivery of the Liquidating Trust Assets to the Liquidating Trust, the Debtors and their respective predecessors, successors and assigns, shall be released from all liability with respect to the delivery thereof and shall have

no reversionary or further interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust in accordance with Section 6.3 of the Plan. For all U.S. federal income tax purposes, and subject to the DOF Election described at Section 6.6 of the Plan, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust in accordance with the terms herein as a transfer to the Liquidating Trust Beneficiaries, followed by a transfer of such assets by such Liquidating Trust Beneficiaries to the Liquidating Trust, and the Liquidating Trust Beneficiaries will be treated as the grantors and owners thereof. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Liquidating Trust Assets to the Liquidating Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, to the maximum extent provided by section 1146(a) of the Bankruptcy Code. In connection with the transfer of such Liquidating Trust Assets, any attorney client privilege, work product privilege, common interest privilege, or any other legal privilege or immunity attaching to any documents, information, or communications (whether written or oral) transferred to the Liquidating Trust shall vest in the Liquidating Trust and its representatives, and the Debtors and the Liquidating Trustee are directed to take all necessary actions to effectuate the transfer of such privileges. The Liquidating Trustee shall agree to accept and hold the Liquidating Trust Assets in the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries, subject to the terms of the Plan and the Liquidating Trust Agreement. The Debtors, the Liquidating Trustee, and any party under the control of such parties will execute any documents or other instruments and shall take all other

steps as necessary to cause title to the Liquidating Trust Assets to be transferred to the Liquidating Trust.

13. <u>Tort Claims Trust Assets</u>. On the Effective Date, title to the Tort Claims Trust Assets shall vest in the Tort Claims Trust free and clear of all Claims, Liens, encumbrances, charges, and other Interests. On the Effective Date, the Tort Claims Trust shall automatically and without further act or deed assume any and all liability of the Debtors and the Insurance Settlement Released Parties for Tort Claims, which are and shall be channeled exclusively to the Tort Claims Trust pursuant to Section 13.6 of the Plan, and upon receipt of the Tort Claims Trust Assets from the Debtors shall have the sole and exclusive responsibility for preserving, managing and distributing the Tort Claims Trust Assets pursuant to the Tort Claims Trust Agreement and the Tort Claim ADR Procedures. Such vesting does not constitute a voidable transfer under the Bankruptcy Code or applicable non-bankruptcy law.

14. <u>Tort Claim ADR Procedures</u>. Within seven (7) business days after the entry of this Confirmation Order, the Tort Claims Trustee, the Debtors, the Committee, the Purchaser, the Municipalities, the objector Tort Claimants, and any other party-in-interest shall meet and confer regarding the proposed Tort Claim ADR Procedures. After such meet and confer, the Tort Claims Trustee shall file a motion to approve the Tort Claim ADR Procedures with the Bankruptcy Court. The Tort Claim ADR Procedures are subject to approval by the Bankruptcy Court with appropriate notice to Tort Claimants and a hearing. The Tort Claim ADR Procedures shall contain, among other things, the procedures by which a Tort Claimant who asserts a right to a jury trial may seek leave of this Court to have the Tort Claim liquidated by a jury trial, subject to any objections or defenses of the Tort Claims Trustee or any other party in interest.

15.     <u>Distributions Under the Plan</u>.  All Distributions under the Plan shall be made in accordance with Article IX of the Plan and such methods of Distribution are approved.

16.     <u>Disputed Claims</u>.  The provisions of Article X of the Plan, including, without limitation, the provisions governing procedures for resolving Disputed Claims, are found to be fair and reasonable and are approved.  In connection with Distributions on account of Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, General Unsecured Claims, and Subordinated Claims, distributions on account of such Disputed Claims shall be made, if at all, in accordance with Article IX of the Plan to the extent any such Disputed Claim becomes Allowed.

17.     <u>Objections to Claims</u>.  After the date hereof, the Liquidating Trustee may file and prosecute objections to Claims, including Administrative Expense Claims, or may pursue any pending objections to Claims, including Administrative Expense Claims.  After the date hereof, the Purchaser may file, prosecute and resolve objections to claims, and/or prosecute and resolve objections to Claims filed by the Debtors, in each case to the extent the Purchaser is liable for or agrees to make payment on such Claims.  After the date hereof, the Tort Claims Trustee may file and prosecute objections to Tort Claims, or may pursue any pending objections to Tort Claims.

18.     <u>Treatment is in Full Satisfaction</u>.  All Distributions under the Plan shall be made in accordance with the Plan.  The treatment set forth in the Plan is in full satisfaction of the legal, contractual and equitable rights (including any liens) that each entity holding a Claim or Interest may have in or against the Debtors, the Estates, or their respective property.  This treatment supersedes and replaces any agreements or rights those entities may have in or against the Debtors, the Estates, or their respective property.

19.     <u>Approval of Rejection of Executory Contracts (11 U.S.C. § 1123(b)(2))</u>.  Pursuant to Article XI of the Plan and sections 365(a) and 1123(b)(2) of the Bankruptcy Code, upon of the

Effective Date, any remaining executory contracts and unexpired leases that exist between the Debtors and any Person or Entity shall be deemed rejected by the Debtors on the Effective Date of the Plan, unless such executory contract or unexpired lease: (i) has been assumed and assigned to the Purchaser, (ii) has been rejected pursuant to an Order of the Bankruptcy Court entered prior to the Effective Date, (iii) as of the Effective Date, is subject to a pending motion to assume; (iv) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (v) is a D&O Liability Insurance Policy.[8]  Subject to the occurrence of the Effective Date, this Confirmation Order constitutes approval of such assumption or rejection pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption or rejection is in the best interests of the Debtors, the Liquidating Trustee, the Estate, and all parties in interest in the Chapter 11 Cases.  Notwithstanding the foregoing, that certain Contribution and Exchange Agreement dated March 1, 2022 by and between Spin, Ford Next LLC and Tier Mobility SE shall be assumed and assigned to the Liquidating Trust as of the Effective Date to the extent such agreement is executory and to the extent such agreement is not executory, the Debtors' shall transfer all right, title, and interest in any Claims or Causes of Action arising thereunder, including, without limitation, those relating to coverage, indemnity, contribution, reimbursement, breach of contract, or any other matters, to the Liquidating Trust and the Tort Claims Trust to the extent that any such Claims or Causes of Action relate to Tort Claims.

20.     _Bar Date for Filing Proofs of Claim Relating to Executory Contacts Rejected Pursuant to the Plan_.  Claims created by the rejection of executory contracts or unexpired leases (including, without limitation, the rejection provided in Section 11.1 of the Plan) or the expiration

---

[8]     The Second Amended Plan provides that D&O Liability Insurance Policies shall be identified in this Confirmation Order.  *See* [ECF No. 802, Section 1.1(49)].  Such policies are set forth in _Exhibit A_ attached hereto.

or termination of any executory contract or unexpired lease prior to the Confirmation Date must be filed with the Bankruptcy Court and served on the Liquidating Trustee no later than thirty (30) days after (a) the date of the entry of any order of the Bankruptcy Court authorizing rejection, with respect to any executory contract or unexpired lease rejected by the Debtors or otherwise pertaining to such order, or (b) the Confirmation Date, with respect to any executory contract or unexpired lease that is deemed rejected pursuant to Section 11.1 of the Plan. Any rejection claim for which a proof of claim is not filed and served within the time provided herein will be forever barred from assertion and shall not be enforceable against the Debtors, or the Estates, assets, properties, or interests in property, or the Liquidating Trustee, or the Estates, assets, properties, or interests in property. Nothing contained herein shall be deemed an admission by the Debtors that such rejection gives rise to or results in a Claim or shall be deemed a waiver by the Debtors or the Liquidating Trustee of any objections to such Claim if asserted. Unless otherwise ordered by the Bankruptcy Court, all Allowed Claims that are timely filed as provided herein shall be treated according to the treatment provided for in their Class, and shall be subject to the provisions of the Plan and the Liquidating Trust or Tort Claims Trust, as applicable.

21. **Channeling Injunction.**

a. **In furtherance of the Plan and the Insurance Settlement Agreements:**

i. **any and all Channeled Claims are hereby channeled to and shall be paid solely and exclusively from the Tort Claims Trust, which shall assume any and all liability of the Debtors and the Insurance Settlement Released Parties for such Tort Claims; and**

ii. **all Persons or Entities who have held or asserted, hold or assert, or may in the future hold or assert a Channeled Claim against the Debtors or any of the Insurance**

Settlement Released Parties are hereby permanently and forever barred, estopped, stayed, and enjoined from taking any action, directly or indirectly, or commencing or continuing any suit, action, or other proceeding on, or asserting, enforcing, or attempting to assert or enforce, any Channeled Claim against the Debtors or any of the Insurance Settlement Released Parties, or any of their property or assets, including without limitation:

1.      pursuing or seeking to pursue, by any manner or means, any Channeled Claim against the Debtors or any of the Insurance Settlement Released Parties;

2.      continuing or commencing, or seeking to continue or commence, by any manner or means, any action or proceeding of any kind with respect to any Channeled Claim against the Debtors or any of the Insurance Settlement Released Parties, or any of their property or assets;

3.      enforcing, attaching, collecting or recovering, or seeking to enforce, attach, collect or recover, by any manner or means, any judgment, award, decree, or order with respect to any Channeled Claim against the Debtors or any of the Insurance Settlement Released Parties, or any of their property or assets;

4.      creating, perfecting or enforcing, or seeking to create, perfect or enforce, by any manner or means, any lien, claim or encumbrance of any kind with respect to any Channeled Claim against the Debtors or any of the Insurance Settlement Released Parties, or any of their property or assets; and

5.      asserting, implementing or effectuating, or seeking to assert, implement or effectuate, by any manner or means, with respect to any

Channeled Claim, any right of setoff, recoupment, indemnification, subrogation or other similar right of any kind, against:

    a.    the Debtors or any of the Insurance Settlement Released Parties;

    b.    any obligation due to any of any of the Debtors or any of the Insurance Settlement Released Parties; or

    c.    the property or assets of the Debtors or any of the Insurance Settlement Released Parties.

The Channeling Injunction is an integral part of the Plan and is essential to the Plan's consummation and implementation.  In the event of a violation of the Channeling Injunction, the Debtors or Liquidating Trustee, as applicable, the Tort Claims Trustee and/or any of the Insurance Settlement Released Parties may seek an order from the Bankruptcy Court enforcing the Channeling Injunction and enjoining such violation and, in connection therewith, may seek an award of costs (including reasonable attorneys' fees and expenses) against the Person or Entity who is found to have violated the Channeling Injunction, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

For ease of reference in connection with the Channeling Injunction and the Bar Order, the following definitions are incorporated herein from the Plan:

- **Bar Order** means the provisions of this Plan, the Insurance Settlement Agreement and the Plan Confirmation Order that shall permanently bar, prohibit, enjoin and restrain the filing, commencing, prosecuting, conducting, asserting or continuing in any manner, directly, indirectly or derivatively all Barred Claims, as more particularly described in ARTICLE XIII, Section 13.9, hereof.

- **Barred Claims** means all Claims against the Debtors and/or the Insurance Settlement Released Parties.

52

- **Barred Persons** means all Persons and Entities having Claims against the Debtors and/or any of the Insurance Settlement Released Parties.

- **Channeled Claims** means any Tort Claim against any of the Debtors and/or any of the Insurance Settlement Released Parties.

- **Insurance Settlement Released Parties** means the Settling Insurers' Parties, all Named Insureds, Additional Insureds, the Purchaser Parties and the Debtors, and is intended to include each Municipality.

- **Municipality** means all of the cities in which the Debtors previously operated and which is either a Named Insured, Additional Insured, or otherwise an entity any of the Debtors is contractually obligated to indemnify, including Charleston, SC, Long Beach, CA, Los Angeles, CA, New Port News, VA, Sacramento, CA, Salt Lake City, UT, San Diego, CA, San Francisco, CA, Santa Clara, CA, Santa Monica, CA, Tempe, AZ, Washington, D.C., Orlando, FL, Chicago, IL, Portland, OR, Providence, RI, and St. Louis, MO.

- **Purchaser** means Bird Scooter Acquisition Corp. or its successors, assigns or designees, as purchaser, under the Asset Purchase Agreement.

- **Purchaser Parties** means Purchaser and: (i) each of its past, present and future parents, subsidiaries, affiliates, and divisions, (ii) each of their respective past, present, and future parents, subsidiaries, affiliates, holding companies, merged companies. related companies, divisions, joint ventures, and acquired companies holding companies, merged companies. Related companies, divisions, joint ventures, and acquired companies; (iii) each of their respective past, present and future directors, officers, managers, members, shareholders, employees, partners, principals, agents, attorneys, lenders, joint ventures, joint venturers, representatives, and managing agents, insurers, reinsurers, and associated third-parties; and (iv) each of their respective predecessors, successors, assignors, and assigns, whether known or unknown, and all Persons or entities acting on behalf of, by, through or in concert with them.

- **Settling Insurers** means (i) the underwriting members of Lloyd's Syndicate 1969 and 1971, (ii) Great American, and (iii) Lexington.

- **Settling Insurers' Parties** means the Settling Insurers and: (i) each of their past, present and future parents, subsidiaries, affiliates, and divisions; (ii) each of their respective past, present, and future parents, subsidiaries, affiliates, holding companies, merged companies, related companies, divisions, joint ventures, and acquired companies; (iii) each of their respective past, present and future directors, officers, shareholders, employees, partners, principals, agents, attorneys, joint ventures, joint venturers, representatives, and managing agents, claims handling administrators, affiliates, insurers, reinsurers, and associated third-parties; and (iv) each of their respective predecessors, successors, assignors, and assigns, whether known or

unknown, and all Persons or entities acting on behalf of, by, through or in concert with them.

- **Tort Claims** means all Claims, whether asserted or unasserted, held by any Person or Entity against the Debtors, the Settling Insurers' Parties, the Purchaser Parties or any Person or Entity who may claim to be an Insured, Additional Insured, or otherwise claim to be entitled to coverage under any of the Insurance Policies or any Insurance Program for bodily or personal injury, tort claim, or property damage related to, or arising out of the use, placement, operation, transportation, renting, leasing, and/or recovery of the Debtors' micro-mobility vehicles and/or arising out of the operation of the Debtors' businesses. Tort Claims include Municipal Claims but exclude the Talon Claims. Notwithstanding the foregoing, Tort Claims do not include claims based on incidents involving automobiles that would otherwise be entitled to coverage under the Debtors' Auto Insurance Policies.

22. **Bar Order.**

In furtherance of the Plan and the Insurance Settlement Agreements:

a. **All Persons and Entities holding a Barred Claim, including without limitation all Barred Persons, shall be permanently and forever barred, estopped, stayed, and enjoined from taking any action, directly or indirectly, or commencing or continuing any suit, action, or other proceeding on, or asserting, enforcing, or attempting to assert or enforce, any Barred Claim against any of the Insurance Settlement Released Parties, or any of their property or assets, including without limitation:**

i. **pursuing or seeking to pursue, by any manner or means, any Barred Claim against any of the Insurance Settlement Released Parties;**

ii. **continuing or commencing, or seeking to continue or commence, by any manner or means, any action or proceeding of any kind with respect to any Barred Claim against any of the Insurance Settlement Released Parties, or any of their property or assets;**

iii. **enforcing, attaching, collecting or recovering, or seeking to enforce, attach, collect or recover, by any manner or means, any judgment, award, decree, or order**

with respect to any Barred Claim against any of the Insurance Settlement Released Parties, or any of their property or assets;

iv.    creating, perfecting or enforcing, or seeking to create, perfect or enforce, by any manner or means, any lien, claim or encumbrance of any kind with respect to any Barred Claim against any of the Insurance Settlement Released Parties, or any of their property or assets; and

v.    asserting, implementing or effectuating, or seeking to assert, implement or effectuate, by any manner or means, with respect to any Barred Claim, any right of setoff, recoupment, indemnification, subrogation or other similar right of any kind, against:

1.    any of the Insurance Settlement Released Parties;

2.    any obligation due to any of the Insurance Settlement Released Parties; or

3.    the property or assets of any of the Insurance Settlement Released Parties.

b.    All Persons and Entities shall be permanently and forever barred, estopped, stayed, and enjoined from taking any action, directly or indirectly, or commencing or continuing any suit, action, or other proceeding on, or asserting, enforcing, or attempting to assert or enforce, any Claim against any of the Insurance Settlement Released Parties arising under or relating to the Insurance Policies, including (i) claims for contribution, subrogation or other equitable apportionment and (ii) claims asserting bad faith.

In the event of a violation of the Bar Order, any of the Insurance Settlement Released Parties may seek an order from the Bankruptcy Court enforcing the Bar Order and enjoining such violation and, in connection therewith, may seek an award of costs (including

reasonable attorneys' fees and expenses) against the Person or Entity who is found to have violated the Bar Order, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

23.    <u>Injunction</u>.  **Except as otherwise expressly provided for in the Plan, from and after the Effective Date, all Persons and Entities are permanently enjoined from commencing or continuing in any manner against the Debtors, the Liquidating Trustee, the Estates, and their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim or Equity Interest, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or satisfied or to be released or satisfied pursuant to the Plan or the Plan Confirmation Order. Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtors, the Liquidating Trustee, the Estate, and their successors and assigns and their assets and properties, any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, solely to the extent that (a) such Claims or Equity Interests have been released or satisfied pursuant to the Plan or the Plan Confirmation Order or (b) such Claims, Equity Interests, actions or assertions of Liens relate to property that will be distributed pursuant to the Plan or the Plan Confirmation Order. The rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Equity Interests against the Debtors or any of their assets or properties solely to the extent that (a) such Claims or Equity Interests have been released or satisfied pursuant to the Plan or the Plan**

Confirmation Order or (b) such Claims, Equity Interests, actions or assertions of Liens relate to property that will be distributed pursuant to the Plan or the Plan Confirmation Order. On the Effective Date, all such Claims against, and Equity Interests in, the Debtors shall be satisfied and released in full. Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Persons and Entities are permanently enjoined on and after the Effective Date, on account of any Claim or Equity Interest satisfied and released pursuant to the Plan or Plan Confirmation Order, from: (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors, the Liquidating Trustee, the Estates and their successors and assigns and their assets and properties; (b) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the Debtors, the Liquidating Trustee, the Estates and their successors and assigns and their assets and properties; (c) creating, perfecting or enforcing any encumbrance of any kind against the Debtors, the Liquidating Trustee, the Estates and their successors and assigns and their assets and properties; and (d) commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Equity Interest or Cause of Action released or settled hereunder. On and after the Effective Date, all persons and entities other than the Liquidating Trustee are permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively or otherwise) on account of or respecting any claim, debt, right, or Retained Cause of Action of the Debtors for which the Liquidating Trustee retains sole and exclusive authority to pursue in accordance with the Plan.

24.     <u>Terms of Injunction</u>.  Unless otherwise provided in this Confirmation Order, all injunctions or stays arising under or entered during these Chapter 11 Cases under sections 105 or

362 of the Bankruptcy Code, or otherwise, that are in existence on the Confirmation Date, other than injunctions issued pursuant to the Plan shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay. The injunctions and orders set forth in Paragraphs 21-23 of this Confirmation Order are permanent injunctions and orders.

25. <u>Releases are Approved</u>. The releases provided herein and set forth in the Plan are reasonable and appropriate given the extraordinary facts and circumstances of these Chapter 11 Cases. The releases result from arm's length negotiations, have been granted in exchange for substantial consideration, were essential to obtaining stakeholder support for the Plan, are appropriate under the circumstances, are consistent with the Bankruptcy Code, and comply with applicable law. Debtors possess considerable leeway in liquidating plans in granting releases of their own claims as a valid exercise of their business judgment. 11 U.S.C. § 1123(b)(3)(A); *see, e.g.*, *In re Advance Watch Company Ltd.,* Case No. 15-12690, 2016 WL 323367, at *6 (Bankr. S.D.N.Y. Jan. 25, 2016) (stating rule); *see also In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 263, n.289 (Bankr. S.D.N.Y. 2007), *appeal dismissed*, 371 B.R. 660 (S.D.N.Y. 2007), *aff'd*, 554 F.3d 420 (2d Cir. 2008) (noting that debtor releases are uncontroversial). The granting of the Debtor Release in the Plan constitutes a prudent exercise of the Debtors' business judgment. *In re Universal Rehearsal Partners, Ltd*., Case No. 22-31966, 2023 WL 2816684, at *4 (Bank. N.D. Tex. Apr. 6, 2023); *In re Midway Gold US, Inc.*, 575 B.R. 475, 510 (Bankr. D. Colo. 2017); *In re Residential Capital, LLC*, Case No. 12-12020 (MG), 2013 WL 12161584, at *13 (Bankr. S.D.N.Y. Dec. 11, 2013).

26.    <u>Releases by the Debtors and Their Estates</u>.

a.    **Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties, each of the Debtors and their current and former Affiliates and Representatives and the Estate shall be deemed to have provided a full, complete, unconditional and irrevocable release to the Released Parties (and each such Released Party so released shall be deemed released by the Debtors and their current and former Affiliates and Representatives and the Estates), from any and all Claims, Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including, without limitation, those that the Debtors would have been legally entitled to assert or that any holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for or on behalf of the Debtors or the Estates, including those in any way related to the Chapter 11 Cases or the Barred Claims, which release shall include any and all Retained Causes of Action, if any, against the Released Parties, or any of them; provided, however, that nothing in Section 13.7(a)(1) of the Plan shall release or be interpreted as a release of the Purchaser's obligations under the Asset Purchase Agreement, the Global Settlement Term Sheet, the Sale Order or any other documents executed by the Purchaser at the Closing.**

59

b.      Without limiting in any fashion the releases by the Debtors and the Estates of the Released Parties as provided in Section 13.7(a)(1) of the Plan, notwithstanding anything contained in the Plan to the contrary and subject only to the Plan Confirmation Order becoming a Final Order, the Debtors and the Estates hereby fully, finally, and completely remise, release, acquit and forever discharge the Insurance Settlement Released Parties from any and all Claims, whether actual or alleged, known or unknown, accrued or unaccrued, existing or potential, or suspected or unsuspected, which release shall include, but shall not be limited to, any and all Tort Claims for coverage under the Insurance Policies arising out of or relating to or in any way involving the Chapter 11 Cases, the Plan or the Barred Claims, whether for wrongful death, personal injury, emotional distress, property damage, economic loss, environmental damage, remediation or exposure, or any other form of loss, expense, or other benefit covered or potentially covered under the Insurance Policies. For the avoidance of doubt, nothing contained herein is intended to release Claims or Causes of Action related to the D&O Liability Insurance Policies against any former directors and officers who are not Released Parties.

27.     <u>Releases by Releasing Parties</u>. **To the fullest extent permitted by applicable law, except as otherwise provided in Section 13.7(b) of the Plan, as of the Effective Date, each of the Releasing Parties shall be deemed to fully, completely, unconditionally, irrevocably, and forever release each of the Released Parties of and from any and all Claims and Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but**

not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors and its current and former Affiliates and Representatives, whether direct, derivative, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise, and which, for the avoidance of doubt, shall include Claims arising out of or relating to the Chapter 11 Cases, the Plan, or the Barred Claims; provided, however, that nothing in Section 13.7(b) of the Plan shall release or be interpreted as a release of any of the Released Parties' or Liquidating Trustee's rights or obligations under the Plan (including with respect to Retained Causes of Action) or the Insurance Settlement Agreements; provided, further, that the releases set forth in Section 13.7(b) of the Plan shall not release any person or entity from any Retained Causes of Action, or any rights or obligations under the Global Settlement Term Sheet, the Asset Purchase Agreement, the Sale Order, or this Plan or Claims resulting from an act or omission determined by a Final Order of a court of competent jurisdiction to have constituted fraud, willful misconduct or gross negligence, provided that, each such Released Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, its actions or inactions.

28. <u>Release by Tort Claims Trustee</u>. **Notwithstanding anything contained in the Plan to the contrary and subject only to the Plan Confirmation Order becoming a Final Order, in consideration of and pursuant to the Insurance Settlement Agreements, the Tort Claims Trustee shall be deemed to fully, completely, unconditionally, irrevocably and forever release the Insurance Settlement Released Parties from any and all Claims and**

61

Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors and its current and former Affiliates and Representatives, whether direct, derivative, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise, and which, for the avoidance of doubt, shall include Tort Claims and any other Claims arising out of or relating to the Chapter 11 Cases or the Plan.

(1)    The releases set forth in Section 13.7 of the Plan are approved pursuant to Bankruptcy Rule 9019 and based on, among other things, the Court's finding that they are: (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the Claims and Causes of Action released by this Plan; (b) in the best interests of the Debtors and all holders of Claims; (c) fair, equitable and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to the assertion of any Claim or Cause of Action thereby released.

29.    Exculpation. **Notwithstanding anything contained in the Plan or herein to the contrary, the Exculpated Parties shall neither have nor incur any liability relating to the Chapter 11 Cases to any Person or Entity for any and all Claims and Causes of Action arising after the Petition Date and through the Effective Date, including any act taken or omitted to**

be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan or distributing property thereunder, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other post-petition act taken or omitted to be taken in connection with the Chapter 11 Cases; provided, however that the exculpation set forth in Section 13.8 of the Plan shall not exculpate any Person or Entity from Claims resulting from an act or omission determined by a Final Order of the Bankruptcy Court to have constituted fraud, willful misconduct or gross negligence; provided that, each such Released Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, its actions or inactions; provided further, however, nothing in the Plan shall limit the liability of attorneys to their respective clients pursuant to rule 4-1.8(h) of the Florida Rules of Professional Conduct. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Released Parties from liability. The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person.

30.     <u>Retention of Causes of Action/Reservation of Rights</u>.  Except as otherwise provided in the Plan or this Confirmation Order, nothing contained in the Plan or this Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or causes of action that the Debtors, the Liquidating Trust, or Tort Claims Trustee may have or which the Liquidating Trust or Tort Claims Trustee may choose to assert on behalf of the Debtors' Estates under any provision

of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a defense, and (ii) the turnover of any property of the Debtors' estates.

31.     Nothing contained in the Plan or this Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, Claims, Retained Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that each Debtor had immediately prior to the Effective Date on behalf of the respective Debtor's Estates or itself in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, any affirmative Retained Causes of Action against parties with a relationship with the Debtor, other than the Released Parties.

32.     On and after the Effective Date, subject to the terms of the Plan, the Insurance Settlement Agreements and the Sale Order, the Liquidating Trustee shall have standing to and may pursue such Retained Causes of Action.

33.     Subject to the Sale Order, no preclusion doctrine, including the doctrines of *res judicata,* collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Retained Causes of Action upon, after, or as a consequence of the Confirmation or Closing.  Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Liquidating Trustee, shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action and to decline to do any of the foregoing without the consent, notice to or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court subject to the terms of the Plan. Notwithstanding anything contained herein to

the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of the Plan itself shall be resolved only by Confirmation of the Plan itself; *provided that*, the Tort Claims Trustee shall have a joint interest in Retained Causes of Action related to the Ford Indemnity Obligations. For the avoidance of doubt, the Retained Causes of Action shall include any and all Causes of Action related to the D&O Liability Insurance Policies against any former directors and officers who are not Released Parties.

34. <u>Transfer Free and Clear of Liens</u>. Except with respect to any fund established pursuant to the Plan, all right, title and interest in and to any and all assets, property, unexpired leases and executory contracts of every kind and nature to be sold, assigned, transferred or otherwise disposed of under the Plan shall be sold, assigned, transferred and disposed of free and clear of any and all Claims, Liens, liabilities, encumbrances, charges and other interests of any entity (as such term is defined in section 101(15) of the Bankruptcy Code) including, without limitation, any and all claims, liens, encumbrances and any and all right, title and interests related thereto arising or resulting from or relating to the transactions contemplated hereby and by the Plan.

35. <u>Liquidating Trust is Not Successor of the Debtors</u>. Except with respect to the payment of the Claims expressly provided for in Articles II – III of the Plan and the rights provided to the Liquidating Trust (including, but not limited to the Retained Causes of Action), the Liquidating Trust shall not be the successor to the Debtors and their Estates. Except with respect to the rights of the Liquidating Trust expressly provided for in the Plan (including, but not limited to, the investigation and pursuit of the Retained Causes of Action), the Liquidating Trust and this Confirmation Order, (i) the Liquidating Trust shall not assume, incur or be responsible for any claims or liabilities of the Debtors or any of their affiliates, and (ii) the Liquidating Trust shall not

be, nor deemed to be, a successor or successor in interest of the Debtors, nor incur any successor or transferee liability of any kind, nature or character, including, without limitation, in relation to (a) any and all liabilities arising or resulting from or relating to the transactions contemplated by the Plan, (b) any and all Claims, Liens, liabilities, encumbrances, charges and other interests arising from or relating to any conduct, liabilities, or obligations of the Debtors, and (c) any and all Claims, Liens, liabilities, encumbrances, charges and other interests and any and all right, title, and interests related thereto, of governmental entities relating to any tax or similar liabilities.

36.     <u>Authorization to Consummate Plan Transactions</u>.  The Debtors, the Liquidating Trustee, and the Tort Claims Trustee are all authorized to consummate the transactions contemplated in the Plan and to enter into, execute and deliver all necessary documents, including those required in connection with the Plan.

37.     <u>Conditions to Effective Date</u>.  The Plan shall not become effective unless and until the conditions set forth in Section 12.1 of the Plan have been satisfied or waived pursuant to Section 12.2 of the Plan.

38.     <u>Retention of Jurisdiction</u>.  Pursuant to Article XIV of the Plan, this Court shall retain and have exclusive jurisdiction over any matter arising under the Bankruptcy Code and arising in or related to these Chapter 11 Cases or the Plan, to the fullest extent as is legally permissible.

39.     <u>Effectuating Documents and Further Transactions</u>.  On or before the Effective Date, and without the need for any further order or authority, the Debtors shall file with this Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors are authorized, without the need for any further order or authority, to execute, deliver, file, or record such

contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.  On and after the Effective Date, The Liquidating Trustee is authorized to execute all documents and enter into all agreements as may be necessary and appropriate in connection with the Plan.

40.     <u>Compliance with Tax Requirements</u>.  In connection with the Plan, the Liquidating Trustee and Tort Claims Trustee will comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities, and all distributions under the Plan shall be subject to such withholding and reporting requirements.

41.     <u>Payment of Statutory Fees</u>.  Notwithstanding any other provisions of the Plan to the contrary, the Debtors shall pay the U.S. Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6), within fifteen (15) days of the entry of this Confirmation Order, for pre-confirmation periods and simultaneously file all the Monthly Operating Reports for the relevant periods, indicating the disbursements for the relevant period.  In addition, the Liquidating Trustee shall pay the U.S. Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6), based upon all post-confirmation periods within the time period set forth in 28 U.S.C. § 1930(a)(6), based upon all post-confirmation disbursements made by the Liquidating Trustee until the earlier of the closing any Chapter 11 Case by the issuance of a Final Decree by the Bankruptcy Court, or upon the entry of an Order by the Bankruptcy Court dismissing any Chapter 11 Case or converting any Chapter 11 Case to another chapter under the United States Bankruptcy Code.  The Liquidating Trustee shall provide to the U.S. Trustee upon the payment of each post-confirmation payment, and concurrently filed with the Court, consolidated, Post-Confirmation Quarterly Operating reports indicating all the combined disbursements for the relevant period. Notwithstanding anything in the

Plan or the Plan Confirmation Order to the contrary, no statutory fees shall be assessed or be payable on any Distributions made by the Tort Claims Trustee after the Effective Date, including Distributions to the holders of Tort Claims.

42.     <u>Exemption from Transfer Taxes</u>.  To the maximum extent provided by section 1146(a) of the Bankruptcy Code, (i) the issuance, Distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors, (ii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, or (iii) any sale by any Debtor consummated post-Confirmation, and any other transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, sales tax, use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local government officials or agents to forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

43.     <u>Exemption from Securities Laws</u>.  To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance of the interests in the Liquidating Trust and the Tort Claims Trust is exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and any other applicable non-bankruptcy law or regulation.

44.    <u>Governmental Approvals Not Required</u>.  This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or other governmental authority with respect to the implementation or consummation of the Plan and Disclosure Statement, any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement and any amendments or modifications thereto.

45.    <u>Notice of Effective Date</u>.  As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors or the Liquidating Trustee shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

46.    <u>Substantial Consummation</u>.  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101(2) and 1127(b) of the Bankruptcy Code.

47.    <u>Reversal</u>.  If any of the provisions of this Confirmation Order are hereafter reversed, modified or vacated by a subsequent order of the Bankruptcy Court or any other court, such reversal, modification, or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under, or in connection with, the Plan prior to receipt of written notice of such order by the Debtors.  Notwithstanding any such reversal, modification or vacatur of this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Confirmation Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of this Confirmation Order, the Plan, all documents relating to the Plan and any amendments or modifications to any of the foregoing.

48.    <u>Retention and Payment of Professionals</u>.  Each of the Liquidating Trustee and Tort Claims Trustee shall have the right, without Court approval, to retain the services of attorneys, accountants, and other professionals and agents, to assist and advise the Liquidating Trustee and

Tort Claims Trustee in the performance of his, her, or its duties, and to compensate and reimburse expenses of such professionals in accordance with the Liquidating Trust Agreement and Tort Claims Trust Agreement. For the avoidance of doubt, the Liquidating Trust and Tort Claims Trustee can retain any professional currently retained by the Creditors' Committee.

49. <u>Conflicts Between Confirmation Order and Plan</u>. The provisions of the Plan and this Confirmation Order shall be construed in a manner consistent with each other so as to effect the purpose of each; *provided, however*, that if there is determined to be any inconsistency between any Plan provision and any provision of this Confirmation Order that cannot be so reconciled, then solely to the extent of such inconsistency, the provisions of this Confirmation Order shall govern and any provision of this Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence. The provisions of this Confirmation Order are integrated with each other and are non-severable and mutually dependent.

50. <u>Post-Confirmation Status Conference</u>. **The Court will conduct a post-confirmation status conference on February 6, 2025 at 1:30 p.m., C. Clyde Atkins United States Courthouse, 301 North Miami Avenue, Courtroom 7, Miami, FL 33128.**

# # #

<u>Submitted by</u>:
Jordi Guso, Esq.
BERGER SINGERMAN LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL  33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340
Email:  jguso@bergersingerman.com

*(Attorney Guso is directed to serve this order upon all non-registered users who have yet to appear electronically in this case and file a conforming certificate of service.)*

# Exhibit A

## D&O Liability Insurance Policies

| | | | |
|---|---|---|---|
| *In re Bird Global, Inc. et al.*, Case No. 23-20514-CLC<br>**Summary of Debtors' Directors and Officers Insurance Policies**[*] | | | |
| *This is intended to be a summary of the Debtors' Directors and Officers Insurance Policies.  Any inadvertent omission of a policy shall not prejudice the Debtors or the Liquidating Trustee's rights with respect to the policies and the Liquidating Trustee reserves the right to amend this summary to the extent necessary. | | | |
| **Form of Policy** | **Policy Number** | **Insurance Carrier** | **Policy Period and Retroactive/Continuity Date** |
| ***Bird Global Directors and Officers Policies November 4, 2022 to November 1, 2023*** | | | |
| Broad Form Management Liability Insurance Policy | Policy No.: 01-766-53-69 | Insurance Carrier: AIG (National Union Fire Insurance Company of Pittsburgh, Pa) | November 4, 2022 – November 1, 2023<br>Continuity Dates:<br>November 4, 2021 |
| Excess Insurance Policy | Policy No.: 652384155 | CNA Insurance Company | November 4, 2022-November 1, 2023 |
| Excess Liability Insurance Policy | Policy No. 0313-1388 | Allied World Insurance Company | November 4, 2022-November 1, 2023 |
| Excess Liability Insurance Policy | Policy No.: 01-XDO-1062-101 | Banyan Risk Ltd. | November 4, 2022-November 1, 2023 |
| Excess Liability Insurance Policy | Policy No.: FRH-H-ML-100000147-01 | Falcon Risk Services | November 4, 2022-November 1, 2023 |
| Excess Liability Insurance Policy | Policy No.: MLXS2210001136-01 | Ascot Insurance Company | November 4, 2022-November 1, 2023 |
| Lead Side A Difference in Conditions Directors and Officers Liability | Policy No.: B0509FINMW2251022 | Marsh Specialty/Inigo Limited | November 4, 2022-November 1, 2023 |
| Premier Excess | Policy No.: 34 DA 0417208-22 | The Hartford | November 4, 2022-November 1, 2023 |
| Excess Insurance | Policy No.: B0509FINMW2251022 | Houston Specialty Insurance Company – A subsidiary of Skyward Specialty Insurance | November 4, 2022-November 1, 2023 |
| Follow Form Insurance Policy | Policy No.: CUAI0865-01 | Canopius | November 4, 2022-November 1, 2023 |

13063866-11

| Commercial Policy | Policy No.: EUW1910041 01 | Wesco Insurance Carrier | November 4, 2022-November 1, 2023 |
| Excess Edge | Policy No. 01-771-27-09 | AIG | November 4, 2022-November 1, 2023 |

| **Form of Policy** | **Policy Number** | **Insurance Carrier** | **Policy Period and Retroactive/Continuity Date** |
|---|---|---|---|
| *Bird Global Directors and Officers Policies Side A DIC Policies December 30, 2022 – November 1, 2023* | | | |
| Excess Follow Form | Policy No.: 47-EPC-326282-01 | Berkshire Hathaway Specialty Insurance | December 30, 2022- November 1, 2023 |
| Excess Edge | Policy No.: 02-307-97-20 | AIG | December 30, 2022- November 1, 2023 |
| Excess Liability | Policy No.: ADX30030314600 | Sompo International; Endurance Assurance Corporation | December 30, 2022- November 1, 2023 |
| Excess Insurance | Policy No.: BPRO8092849 | Berkley Insurance Company | December 30, 2022- November 1, 2023 |
| **Form of Policy** | **Policy Number** | **Insurance Carrier** | **Policy Period and Retroactive/Continuity Date** |
| *Bird Global Directors and Officers Policies November 1, 2023 to November 1, 2024* | | | |
| Executive Edge | Policy No.: 01-615-54-22 | AIG | November 1, 2023- November 1, 2024 Continuity: November 4, 2021 |
| Excess Side A Difference in Conditions Directors and Officers Liability | Policy No.: B0509FINMN2350729 | Marsh Specialty/Inigo Limited | November 1, 2023- November 1, 2024 |
| Excess Insurance Policy | Policy No.: 768747509 | CNA; Continental Casualty Company | November 1, 2023- November 1, 2024 |
| Excess Edge | Policy No.: 01-615-54-26 | AIG | November 1, 2023- November 1, 2024 |

73